IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
FOR THE WESTERN DIVISION

| | | |
|---|---|---|
| MOON FENTON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: _____ |
| | ) | Judge: _____ |
| THE WEST CLINIC, PLLC, f/k/a THE | ) | |
| WEST CLINIC, PC, d/b/a WEST CANCER CENTER,) | | |
| WEST LEASECO, LLC, | ) | |
| WEST DESOTO PARTNERS, LLC, | ) | |
| WEST PARTNERS, LLC, | ) | **JURY DEMAND** |
| WEST UNION PARTNERS, LLC, | ) | |
| WEST WOLF RIVER PARTNERS, L.P., f/k/a | ) | |
| WEST WOLF RIVER PARTNERS, LLC, | ) | |
| WEST CAPITAL, LLC, | ) | |
| WEST CLINIC HOLDCO, PC, and | ) | |
| WEST EQUITY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

COMES NOW, the Plaintiff, MOON FENTON, M.D., by and through counsel, who sues the Defendants, and for cause of action, would show unto this Honorable Court as follows:

1.      The Plaintiff, Moon Fenton, M.D., is a citizen and resident of Baden, Pennsylvania.

2.      The Defendant, The West Clinic, PLLC, f/k/a The West Clinic, P.C., d/b/a West Cancer Center (herein after "The West Clinic"), is a corporation originally formed April 28, 1993 with its principal place of business at 7945 Wolf River Blvd, Germantown, TN 38138-1762, Shelby County, Tennessee, and may be served with process through the registered agent: Reid D. Evensky, 850 Ridge Lake Blvd., Suite 200, Memphis, TN 38120-9460.

3. The Defendant, West Leaseco, LLC, is a corporation originally formed January 3, 2019 with its principal place of business at 7945 Wolf River Blvd, Germantown, TN 38138-1762, Shelby County, Tennessee, and may be served with process through the registered agent: C.T. Corporation System, 300 Montvue Rd., Knoxville, Tenn. 37919-5546.

4. The Defendant, West Desoto Partners, LLC is a corporation formed on August 28, 2002 with its principal place of business at 7945 Wolf River, Germantown, TN 38138100, Shelby County, Tennessee, and may be served with process through the registered agent: Kurt Tauer M.D., 7945 Wolf River, Germantown, TN 38138.

5. The Defendant, West Partners, LLC, is a corporation originally formed on December 28, 1995 with its principal place of business at 7945 Wolf River, Germantown, TN 38138, and may be served with process through the registered agent: Reid D. Evensky, 850 Ridge Lake Blvd., Suite 200, Memphis, TN 38120-9460.

6. The Defendant, West Union Partners, LLC, is a corporation originally formed on June 11, 2004, with its principal place of business at 7945 Wolf River, Germantown, TN 38138, Shelby County, Tennessee, and may be served with process through the registered agent: Kurt Tauer M.D., 7945 Wolf River, Germantown, TN 38138.

7. The Defendant, West Wolf River Partners, L.P., f/k/a West Wolf River Partners, LLC, is a Limited Partnership, originally formed as an LLC on January 3, 2019, and converted to a LP on November 26, 2019 with its principal place of business at 7945 Wolf River Blvd, Germantown, TN 38138-1762, Shelby County, Tennessee, and may be served with process through the registered agent: Reid D. Evensky, 850 Ridge Lake Blvd., Suite 200, Memphis, TN 38120-9460.

8. The Defendant, West Capital, LLC, is a corporation originally formed on October 10, 2019 with its principal place of business at 7945 Wolf River Blvd, Germantown, TN 38138-

1762, Shelby County, Tennessee, and may be served with process through the registered agent: C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

9.      The Defendant, West Clinic HoldCo, PC, is a corporation originally formed on November 21, 2019 with its principal place of business at 7945 Wolf River Blvd, Germantown, TN 38138-1762, Shelby County, Tennessee, and may be served with process through the registered agent: Reid D. Evensky, 850 Ridge Lake Blvd., Suite 200, Memphis, TN 38120-9460.

10.     The Defendant, West Equity, LLC, is a corporation originally formed on December 11, 2019 with its principal place of business at 7945 Wolf River Blvd, Germantown, TN 38138-1762, Shelby County, Tennessee, and may be served with process through the registered agent: C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

11.     Jurisdiction is based on Diversity of Citizenship, pursuant to 28 U.S.C. § 1332, and the amount in controversy is in excess of $75,000.  Venue is proper pursuant to 28 U.S.C. § 1391.

12.     At all times material hereto, on information and belief, the Defendants were interrelated and for the most part had the same CEO, the same Board Members, the same members, partners, and/or shareholders, the same executives, and they shared the same employees.

13.     The Plaintiff was originally hired by the Defendant, The West Clinic, on June 2, 2012 as a Hematology Medical Oncologist, and she was continuously employed until she voluntarily terminated her employment effective July 31, 2020.

14.     The West Clinic was originally formed as a P.C. on April 28, 1993, and it was converted to a Professional Limited Liability Company ("PLLC") effective November 27, 2019, and at that time, its name was changed to The West Clinic, PLLC as reflected in the Certificate of Conversion that was filed with the Tennessee Secretary of State on November 27, 2019.

15.     In March 2015, the CEO of Defendant, The West Clinic, was Erich Mounce.

3

16.     Erich Mounce became CEO of Defendant, The West Clinic, in or about April of 2010, and he remained CEO until in or about December 2018.

17.     On information and belief, Mounce was also CEO for the other named Defendants and/or their predecessors, and he remained CEO thereof until in or about December 2018, and he thereafter was replaced as CEO by Mitch Graves.

18.     As CEO of the Defendant, The West Clinic, Erich Mounce had the authority to enter into binding contracts on behalf of the Defendant, The West Clinic.

19.     In March 2015, the Plaintiff was given the opportunity to become a shareholder of the Defendant, The West Clinic.

20.     Prior to Plaintiff agreeing to become a shareholder of Defendant, The West Clinic, it was represented to her by the CEO, Erich Mounce, that if the Plaintiff became a shareholder she would become part owner in a valuable company, and would receive compensation at the 95th percentile of the Hematology/Medical Oncology physicians in the United States.

21.     As a shareholder in the Defendant, The West Clinic, the CEO, Erich Mounce, promised and represented to the Plaintiff, she would receive salary, bonuses that would be calculated in the same manner as the other shareholders, she would have equal voting rights with the other physician shareholders, and she would receive six (6) weeks paid vacation, continuing medical education, and retirement benefits.

22.     As a shareholder in the Defendant, The West Clinic, the CEO Erich Mounce, promised and represented to the Plaintiff that as part of her "buy-in" as a shareholder in The West Clinic, she would be an equal owner with the other shareholders in The West Clinic.

23.     As a shareholder in the Defendant, The West Clinic, the CEO Erich Mounce, promised and represented to the Plaintiff that as part of her "buy-in" as a shareholder in The West

Clinic, she would be an equal owner with the other shareholders in The West Clinic, in certain affiliated and related entities, including the Defendants: West Desoto Partner, LLC, West Partners, LLC, and West Union Partners, LLC.

24.     Prior to Plaintiff agreeing to become a shareholder in Defendant, The West Clinic, the CEO, Erich Mounce, also promised and represented to Plaintiff that she would receive an annual salary of $510,000, and she would receive bonuses calculated the same as the other shareholders.

25.     Prior to Plaintiff agreeing to become a shareholder in Defendant, The West Clinic, CEO, Erich Mounce promised and represented to Plaintiff that the cost of the buy-in to the Defendant, The West Clinic, was $500,000.

26.     Prior to agreeing to become a shareholder in the Defendant, The West Clinic's CEO, Erich Mounce, promised and represented that money would be deducted from her bonuses on an annual basis until a total of $500,000 had been paid toward the buy-in.  The amount deducted from her bonuses toward her buy-in would be based on declining percentages, as follows:

> Year 1, 80%
>
> Year 2, 60%
>
> Year 3, 40%
>
> Year 4, 20%

until a total of $500,000 had been deducted from Plaintiff's bonuses.

27.     Prior to Plaintiff agreeing to become a shareholder in Defendant, The West Clinic, the CEO, Erich Mounce promised and represented to Plaintiff that if she were to leave her employment with the Defendant, The West Clinic, the amount she paid pursuant to her "buy-in" would be refunded to her.

28.     Prior to Plaintiff agreeing to become a shareholder in Defendant, The West Clinic, it

was Plaintiff's understanding that The West Clinic owned valuable real estate, significant assets, and significant accounts receivable.

29.     Unbeknownst to the Plaintiff, at the time the Plaintiff agreed to buy-in to The West Clinic, The West Clinic did not own any assets, including real estate, equipment, and its accounts receivable.

30.     In or around 2011, the Defendant, The West Clinic, had sold its assets, including real estate, equipment, and its accounts receivable to the Methodist University Hospital in Memphis, Tennessee, and that the shareholders of the Defendant, The West Clinic, had received significant cash payouts for their individual ownership interests in The West Clinic.

31.     In or around 2011, the Defendant, The West Clinic, entered into an agreement with the Methodist University Hospital in Memphis, Tennessee, wherein they agreed to pay the Defendant, The West Clinic, an amount based on the productivity of its physicians based on Relative Value Units ("RVU's").

32.     The Methodist University Hospital agreed to pay the Defendant, The West Clinic, a very lucrative amount per RVU of around One Hundred Forty Dollars ($140.00).

33.     At the time the Plaintiff agreed to "buy-in" to The West Clinic, the CEO, Mounce, and the other shareholders of The West Clinic, had special knowledge of the fact that The West Clinic, had previously sold its assets to Methodist, and that its shareholders had been paid significant pay-outs.

34.     At the time the Plaintiff agreed to "buy-in" to The West Clinic, the fact that The West Clinic, had sold its assets and that its shareholders had been paid significant pay-outs, was not ascertainable by the Plaintiff and was not available through public sources.

35.     Prior to agreeing to "buy-in" to The West Clinic, at no time did Defendants' CEO,

6

Erich Mounce, or anyone else, inform the Plaintiff that The West Clinic had sold its assets in or around 2011, and that its shareholders had been paid significant pay-outs.

36.     When making the above referenced promises and representations, Erich Mounce was acting as an agent of the Defendant, The West Clinic, with full authority to speak on its behalf, and the promises and representations were made to induce Plaintiff's reliance thereon.

37.     When making the above referenced promises and representations, Erich Mounce was acting on behalf of the Defendant, The West Clinic, and acting in a manner deemed to benefit its interests.

38.     The Plaintiff trusted Erich Mounce, the Defendant, The West Clinic's CEO.

39.     Prior to Plaintiff agreeing to become a shareholder in Defendant, The West Clinic, the Plaintiff made requests for written explanations of the compensation model, but Erich Mounce failed to provide this stating that the compensation model was new and was not written in any physician contracts.

40.     Prior to Plaintiff agreeing to become a shareholder in Defendant, The West Clinic, the Plaintiff made requests for a copy of the shareholders' agreement, but Erich Mounce, the Defendant, The West Clinic's CEO, replied "the new contracts are a work in progress."

41.     However, unbeknownst to the Plaintiff, the shareholders of The West Clinic had entered into a Shareholder's Agreement dated January 1, 2015.

42.     The Plaintiff was never presented or asked to sign The West Clinic's Shareholder's Agreement dated January 1, 2015.

43.      In reliance on Mounce's promises and representations, the Plaintiff agreed to become a shareholder in Defendant, The West Clinic, on March 1, 2015 on the terms as represented and promised by Eric Mounce, the Defendant, The West Clinic's CEO.

44.     The Plaintiff detrimentally relied on the promises and representations of Erich Mounce, the Defendant, The West Clinic's CEO.

45.     The Plaintiff justifiably relied on the promises and representations of Erich Mounce, the Defendant, The West Clinic's CEO.

46.     It was reasonable for Plaintiff to rely on the promises and representations of Erich Mounce, the Defendant, The West Clinic's CEO.

47.     The Plaintiff's contract with Defendant, The West Clinic included: 1.) she would receive bonuses calculated the same as the other shareholders, 2.) that we would be allowed to "buy-in" to The West Clinic for the total of $500,000 and this amount would be deducted from her bonuses based on the declining percentages as set forth in Paragraph 26 hereof, and 3.) that if she ever left employment with Defendant, The West Clinic, she would be refunded the full amount of her "buy-in."

48.     After reaching the agreement to buy-in to The West Clinic, the Plaintiff was never presented with a written agreement with respect to the to the "buy-in".

49.     The Plaintiff's agreement to "buy-in" as a shareholder into Defendant, The West Clinic, was based on an oral contract.

50.     The Plaintiff's agreement to "buy-in" to Defendant, The West Clinic, constituted a binding contract between Plaintiff and the Defendant, The West Clinic.

51.     Beginning after March 1, 2015, the Defendant, The West Clinic, deducted money from Plaintiff's bonuses to applied to her "buy-in" to The West Clinic.

52.     After March of 2015, the Defendant, The West Clinic's documents reflected that Plaintiff was a shareholder of the Defendant, The West Clinic.

53.     From March 1, 2015 through February 21, 2019, the Plaintiff did not have a written

Employment Agreement with the Defendant, The West Clinic.

54.     The Plaintiff faithfully performed under the terms of the contract with the Defendant, The West Clinic, by authorizing the amounts attributed to her RVU's to be paid to it, by diligently working for the Defendant, by remaining employed with Defendant, and by allowing money to be deducted from her bonuses to be applied to her buy-in.

55.     From March 1, 2015, through the date of her voluntary termination effective July 31, 2020, the Plaintiff faithfully performed her side of the contract with Defendant, The West Clinic, in reliance on the promises and representations of Erich Mounce, the Defendant, The West Clinic's CEO.

56.     From March 1, 2015, forward, the Plaintiff reasonably relied on the promises and representations of Erich Mounce, the Defendant, The West Clinic's CEO, to her detriment.

57.     From March 1, 2015 forward, agents and employees of the Defendant, The West Clinic, confirmed and ratified Plaintiff's contract in various ways, including by accepting the money paid to it from Methodist for Plaintiff's RVU's, by deducting money from her bonuses to be applied to the cost of the buy-in, and by listing her as a shareholder in company documents.

58.     The Defendant, The West Clinic, filed its Annual Report on March 31, 2019, listing Plaintiff as a Vice President and a member of its Board of Directors. (See Annual Report, attached as Exh. 1).

59.     As of March 31, 2019, The Defendant, The West Clinic, had twenty (20) shareholders, and Plaintiff was one of these shareholders.

60.     In or about December 2018, the former CEO, Erich Mounce, resigned his employment with the Defendant, The West Clinic.

61.     In or about December 2018, the Defendant, The West Clinic hired a new CEO, Mitch

Graves.

62.     In or about December 2018, the agreement between the Defendant, The West Clinic, P.C. and Methodist University Hospital was terminated.

63.     In or about December 2018, the Plaintiff discovered that at the time she agreed to "buy-in" to The West Clinic, in March 2015, the Defendant, The West Clinic, owned no real estate, and owned no other assets, and that it would have to buy back such assets from Methodist to be able to stay in business.

64.     In or about December 2018, the Plaintiff discovered that, prior to her agreement to buy-in to The West Clinic, that its assets had been transferred to Methodist University Hospital and, in fact, the shareholders of The West Clinic at that time, had received substantial monies as part of this transaction.

65.     In or about December 2018, the Plaintiff discovered that, in reality, she had bought into an empty shell.

66.     As part of the termination of the agreement between the Defendant, The West Clinic, and Methodist, the Defendants agreed to buy back the equipment and assets that previously were conveyed to Methodist.

67.     Defendant, The West Clinic, thereafter appropriated the majority of Plaintiff's bonus for 2018 to help fund the buy-back of the assets in the approximate amount of $400,000 to her great loss and detriment.

68.     On February 22, 2019, the Defendant, The West Clinic, purchased back the medical building it sold to Methodist in December of 2013 for $22.5 million for a purchase price of $51 million.

69.     In or about February 22, 2019, the Plaintiff and the other shareholders of The West

Clinic were requested to sign a personal guaranty to secure the loan used to acquire the building.

70.     The Plaintiff signed the personal guaranty in continued reliance on the contract she had entered into with respect to the "buy-in" to the Defendant, The West Clinic.

71.     On or about February 22, 2019, the Defendant, The West Clinic, entered into agreements with OneOncology, LLC, and OneOncology Central, LLC, where certain non-real estate assets were sold to OneOncology, LLC/OneOncology Central, LLC.

72.     In 2019, the Plaintiff and the other shareholders of The West Clinic, by virtue of the fact they were shareholders in The West Clinic, received equal ownership interests in entities affiliated with the Defendant, The West Clinic, including:

1.   West Leaseco, LLC (formed January 3, 2019),

2.   West Wolf River Partners, LP (originally formed as an LLC on January 3, 2019, and converted to an LP on November 26, 2019),

3.   West Clinic Holdco, P.C. (formed November 21, 2019),

4.   West Capital, LLC (formed October 10, 2019),

5.   West Equity, LLC (formed December 11, 2019).

73.     Plaintiff's ownership in the entities listed in paragraph 72 above was identical to the ownership percentage of the other members/shareholders of The West Clinic.

74.     In or about February 20, 2019, the new CEO of Defendant, The West Clinic, Mitch Graves, requested for Plaintiff sign a document purporting to terminate her "employment agreement" with The West Clinic, even though she had not signed an employment agreement when she became a shareholder on March 1, 2015.

75.     In further reliance on the buy-in contract with the Defendant, The West Clinic, Plaintiff complied with this request. (A copy of the Termination of Employment Agreement

document is attached hereto as Exh. 2).

76.     The Termination of Employment Agreement Plaintiff signed was not a general release, and it did not release the Plaintiff's claims against the Defendant, The West Clinic.  (See Exh. 2).

77.     Thereafter, on or about February 22, 2019, the Plaintiff was requested to sign an Employment Agreement with The West Clinic.

78.     In further reliance on the buy-in contract with the Defendant, The West Clinic, the Plaintiff complied with this request.  (A copy of the Employment Agreement is attached hereto as Exh. 3).

79.     Neither the Termination of Employment Agreement document (Exh. 2) or the Employment Agreement (Exh. 3) referenced Plaintiff's contract to buy-in to Defendant, The West Clinic, and neither agreements impacted Plaintiff's contract to buy-in to Defendant, The West Clinic.

80.     Thereafter, on November 30, 2019, Plaintiff and the other shareholders of the Defendant, The West Clinic, were requested to sign a Termination of Shareholders' Agreement document wherein the January 1, 2015 Shareholder's Agreement was terminated even though the Plaintiff had not signed said Shareholders' Agreement.  (A copy of the Termination of Shareholders' Agreement is attached as Exh. 4).

81.     The Termination of Shareholders' Agreement (Exh. 4) also stated that the Shareholders intended "to restructure the organization of the company and its affiliates" ('Restructure') and therefore intend to transfer all shares of the shareholders to a new entity, "'West Clinic Holdco, P.C.'".

82.     The Defendant, The West Clinic, filed its Articles of Organization at the Tennessee

Secretary of State on November 27, 2019 wherein The West Clinic was converted to a PLLC effective December 1, 2019.  (*See* Articles of Organization attached as Exh. 5).

83.     The Defendant, The West Clinic, PLLC's Articles of Organization stated that "there are fewer than six (6) members".  (Exh. 5, ¶9).

84.     On or about December 1, 2019, the Plaintiff and the other shareholders of The West Clinic executed an Operating Agreement for the Defendant, The West Clinic.

85.     Thereafter, Plaintiff was issued 100 shares in West Clinic Holdco, P.C.

86.     The 100 shares Plaintiff was granted in West Clinic Holdco, P.C. represented 5% of the ownership of West Clinic Holdco, P.C.

87.     The Plaintiff never signed any document wherein she conveyed her stock owned in the Defendant, The West Clinic, to West Clinic Holdco, P.C.

88.     To the date of Plaintiff's voluntary termination from The West Clinic, Plaintiff continued to attend "shareholder" meetings of the Defendant, The West Clinic.

89.     In or about March, 2019, the Plaintiff's salary was raised to $710,000 per year with the Defendant, The West Clinic, and she continued receiving bonuses.

90.     On information and belief, after December 1, 2019, the Defendant, The West Clinic, continued deducting money from Plaintiff's bonuses allegedly toward the cost of her "buy-in" to The West Clinic, up through the date of her termination, July 31, 2020.

91.     In or about March 2020, the Defendant, The West Clinic, laid off approximately 140 employees.

92.     In or about April 2020, the executives of Defendant, The West Clinic, P.C., applied for a Paycheck Protection Program ("PPP"), CARES Act loan in the amount of $10,000,000.

93.     It was Plaintiff's understanding that Defendant, The West Clinic, thereafter planned

to seek forgiveness of the $10,000,000 loan pursuant to the terms of the CARES Act at the appropriate time.

94.     The Defendant, The West Clinic, represented to the SBA that the $10,000,000 PPP, CARES Act loan was to "Aid it to maintain its work force during the COVID-19 pandemic."

95.     On April 20, 2020, the Plaintiff gave ninety (90) days' notice to The West Clinic that her last day of employment would be July 31, 2020 as permitted by and pursuant to the Employment Agreement (at Exh. 3).

96.     On April 27, 2020, the Small Business Administration ("SBA") paid the Defendant, The West Clinic, $10,000,000 pursuant to the Paycheck Protection Program ("PPP") of the CARES Act**.**

97.     However, even though it obtained the PPP loan, the Defendant, The West Clinic did not hire back the 140 employees laid off.

98.     Prior to July 2020, the executives of Defendant, The West Clinic, made the decisions to terminate the agreement with OneOncology, LLC, and OneOncology Central, LLC, and to buy back its assets from OneOncology, LLC, and OneOncology Central, LLC.

99.     In connection with the termination of the agreement with OneOncology, LLC/OneOncology Central, LLC, the Plaintiff and the other "shareholders" in The West Clinic, P.C. were requested to sign an Unanimous Written Consent Agreement, dated July 10, 2020. (Unanimous Written Consent Agreement, attached hereto as Exhibit 6).

100.    The "Unanimous Written Consent" document (Exh. 6) falsely stated, in part: "the undersigned being all of the directors and members of The West Clinic, PLLC…", and it listed the names of 19 "members", including listing Plaintiff's name as a "member".

101.    At the time of the execution of the Unanimous Written Consent Agreement, July 10,

2020 (*see* Exhs. 5 & 6), The West Clinic, PLLC had only one member, West Clinic Holdco, P.C.

102.    West HoldCo, LLC was not a signatory to the Unanimous Written Consent Agreement. (*See* Exh. 6)

103.    The West Clinic, PLLC, only had one member as of July 10, 2020, West Clinic Holdco, P.C.

104.    All "members" of Defendant, The West Clinic, that were listed on the Unanimous Written Consent Agreement dated July 10, 2020 (at Exh. 6), signed the agreement, except for the Plaintiff.

105.    The Plaintiff was a member of the Defendant, The West Clinic, as of July 10, 2020.

106.    The Unanimous Written Consent document (Exh. 6) references "a side letter affecting the company's application for and receipt of loan proceeds available under the CARES Act."

107.    On August 27, 2020, Defendant, The West Clinic, caused to be filed with the Tennessee Secretary of State paperwork changing its member count from 0 to 18.  (*See* Exh.7).

108.    The Plaintiff was not a member/shareholder of the Defendant, The West Clinic, on August 27, 2020.

109.    Prior to July 10, 2020, the Plaintiff and certain other "members/shareholders" raised concerns that the PPP, CARES Act proceeds were not being used for the intended purposes, but instead was being used by The West Clinic to buy back its assets from OneOncology/OneOncology Central.

110.    In connection with the termination of the agreement with OneOncology/OneOncology Central, the buyback of assets, and the $10,000,000 PPP, CARES Act loan, the Defendant, The West Clinic, executed a Master Restructuring Agreement on July 10, 2020

with OneOncology/OneOncology Central, LLC.  (Copy attached as Exh. 8).

111.    The Master Restructuring Agreement dated July 10, 2020 contains certain attachments, and Plaintiff does not have these attachments but they are in the possession of the Defendants.

112.    The closing of the Master Restructuring Agreement took place as of the "Effective Date" of July 11, 2020.  (*See* Exh. 8).

113.    At the closing of the "buyback", the Defendant, The West Clinic paid OneOncology/OneOncology Central approximately $10,000,000.

114.    The Effective Date of the Master Restructuring Agreement was July 11, 2020, and this was prior to Plaintiff's last day of employment.  (*See* Exh. 8).

115.    Prior to the termination of her employment, Defendants' agents attempted to talk Plaintiff out of terminating her employment, representing she should wait at least six (6) months before she leaves because, by that date, the value of her interests in the Defendants would be worth significantly more as a result of the forgiveness of the $10,000,000 PPP, CARES Act loan.

116.    At the time Plaintiff gave ninety (90) days' notice of the termination of her employment, as herein alleged, Plaintiff was an equal member/shareholder along with the other shareholder physicians in Defendant, The West Clinic.

117.    At the time Plaintiff gave ninety (90) days' notice of the termination of her employment, she was an equal owner with the other members/shareholders in the following entities:

(1) The West Clinic, PLLC;
(2) West Leaseco, LLC;
(3) West Desoto Partners, LLC;
(4) West Partners, LLC;
(5) West Union Partners, LLC;
(6) West Wolf River Partners, LP;
(7) West Capital, LLC;
(8) West Clinic HoldCo, P.C.; and

(9) West Equity, LLC.

118.    From March 2015, through the date of Plaintiff's termination, Defendant, The West Clinic, never provided Plaintiff with a report or other document that stated the amount of her bonuses that were being deducted for the "buy-in" as a shareholder of the Defendant, The West Clinic.

119.    However, in 2017, Defendant, The West Clinic's CEO, Erich Mounce, provided Plaintiff a verbal explanation of deductions made from her bonus in 2016 and the categories that went in to the calculation of her bonus, and Plaintiff wrote this down contemporaneously and Plaintiff thereafter provided these notes to Defendant, The West Clinic's CEO, Mitch Graves, on July 21, 2020, after she had been given notice of her termination.  (*See*  Exh. 9).

120.    From March 2015 through the date of her termination, Plaintiff was never provided by Defendant, The West Clinic, with a report or other document that stated the total amount of bonuses that Plaintiff earned, or that showed and/or explained the deductions that Defendant, The West Clinic, was making from those bonuses, or that explained how the bonuses of the other physicians had been calculated.

121.    From March 2015 through the date of Plaintiff's termination, and thereafter, the Defendant, The West Clinic, discouraged the Plaintiff, and other The West Clinic, physicians from asking questions concerning their bonuses, and it actively concealed the pertinent information.

122.    The shareholders were informed that the amount of their bonuses could be decreased if they were not "good citizens" and Plaintiff understood this meant they were not to ask questions.

123.    From March 2015, through the date of the termination of her employment on July 31, 2020, the Defendant, The West Clinic, withheld substantially more than the agreed upon $500,000 from her bonuses for the cost of the "buy-in" into the Defendant, The West Clinic, thereby converting and misappropriating her money, and breaching the contract with Plaintiff.

124.    For the time period from March 1, 2015 through December 31, 2018, the Plaintiff's work RVU's ranged between seven thousand (7,000) and ten thousand (10,000) per year.

125.    From March 1, 2015 through in or about December 31, 2018, while Defendant's agreement with Methodist University Hospital remained in effect, Methodist University Hospital was paying to the Defendant, The West Clinic, approximately One Hundred Forty Dollars ($140.00) per physician work RVU's, including for Plaintiff's work RVU's.

126.    The Defendant, The West Clinic's agents and employees would periodically determine how much each physician would receive for "productivity", "quality metrics", and for performing "education" duties, and they were secretive throughout Plaintiff's employment as to the various components used to calculate the bonuses and with respect to how the bonuses of the other shareholders were determined or the amounts thereof.

127.    In fact, even Plaintiff's Physician Employment Agreement (Exh. 3), signed on February 22, 2019, makes a vague reference to "compensation", stating simply: "physicians' compensation will be paid in accordance with the Employer's shareholder physician compensation policies".

128.    Shortly before March 1, 2019, the Plaintiff discovered that contrary to the promises and representations of the Defendant, The West Clinic's CEO, Erich Mounce, that the other shareholders of Defendant, The West Clinic, including, Dr. Sonia Benn, Dr. Sylvia Richey, Dr. Stephen Besh, and Dr. Gary Tian, had been paid and were being paid higher bonuses than Plaintiff.

129.    From March 1, 2015 through the date Plaintiff's voluntary termination, Plaintiff's RVU's and quality metrics were the same or higher than other shareholders of Defendant, The West Clinic, including, Dr. Sonia Benn, Dr. Sylvia Richey, Dr. Stephen Besh, and Dr. Gary Tian.

130.    Shortly before March 1, 2019, the Plaintiff discovered that contrary to the promises

and representations of Defendants' CEO, Erich Mounce, that the other shareholders of Defendant, The West Clinic, had received annual bonuses ranging between $700,000 - $800,000 during the relevant time period, even though Plaintiff's productivity and quality metrics were as high or higher than the other shareholders.

131.    After the Plaintiff gave ninety (90) days' notice of termination, Plaintiff inquired about the bonuses she was owed, and she also inquired about the buy-out of her ownership, and she was advised by the Defendants' CEO, Mitch Graves, "[t]here is no buy-out in the agreement." (*See* Exh. 10).

132.    Further, Plaintiff specifically questioned the Defendant, The West Clinic's CEO, Mitch Graves, why some of the other shareholders had received much higher bonuses than Plaintiff, but she was stonewalled on the issue of the bonuses, and Plaintiff never received a satisfactory answer. (*See* July 25, 2020 email exchange, attached hereto as Exhibit 10).

133.    To the date of the filing of this Complaint, Plaintiff never signed any document where Plaintiff signed away her ownership interest in any of the following entities:

(1) The West Clinic, PLLC;
(2) West Leaseco, LLC;
(3) West Desoto Partners, LLC;
(4) West Partners, LLC;
(5) West Union Partners, LLC;
(6) West Wolf River Partners, LLC;
(7) West Capital, LLC;
(8) West Clinic HoldCo, P.C.; and
(9) West Equity, LLC.

134.    It is the Defendant, The West Clinic's position that Plaintiff no longer has any ownership interest in Defendant, The West Clinic.

135.    It is the Defendant, The West Clinic's position that Plaintiff no longer has any ownership interest in Defendant, The West Clinic, even though she was not paid anything for her

ownership interest.

136.   It is the Defendants' position that Plaintiff no longer has any ownership interest in Defendants, West Leaseco, LLC, West Desoto Partners, LLC, West Partners, LLC, West Union Partners, LLC, West Wolf River Partners, LLC, West Capital, LLC, West Clinic HoldCo, PC, and/or West Equity, LLC.

137.   Some or all of The Operating Agreements for the above entities require the Defendants to calculate and pay the Plaintiff the fair value for her ownership interests at the termination of her employment.

138.   At no time did any of the Defendants provide the Plaintiff with a calculation of the net worth or fair value of the Defendants as determined by independent public accountants or as determined by anyone else.

139.   If and when such calculations of the net worth and/or fair value is performed, it should take in to consideration, the fact that the $10,000,000 PPP, CARES ACT loan, was to be "forgiven".

140.   It is the Defendants' position that Plaintiff has received all bonuses that were due to her.

141.   It is Defendants' position that Plaintiff is owed no further bonuses.

142.   It is Defendants' position that Plaintiff's bonuses were properly calculated.

143.   It is Defendants' position that Plaintiff was treated fairly and equally as the other members/shareholders of Defendants.

144.   It is Defendant's position that she is not entitled to anything for her ownership interests in the named Defendants.

145.   As a result of the wrongful actions of the Defendants, the Plaintiff was deprived of a

significant amount of bonuses that were lawfully due her, much to her great financial detriment.

146.    The Plaintiff is owed significant money for her ownership interests in the Defendants to which she had a contractual right, and to which she has been wrongfully denied to her, much to her great financial detriment, and for which she seeks an accounting, a valuation, and appropriate damages.

147.    Pursuant to her contract with the Defendant, The West Clinic, all monies Defendant deducted from her bonuses for her ownership interest should have been paid back to her upon her termination of employment. Defendant failed and refused to do this, and thereby breached the contract and converted Plaintiff's money.

148.    Pursuant to her contract with the Defendant, The West Clinic, no more than $500,000 should have been deducted from her bonuses, but on information and belief, Defendant, The West Clinic, deducted much more, thereby converting and misappropriating her money, and also breaching the contract.

149.    The Defendants misappropriated and embezzled money that should have been paid to the Plaintiff for her bonuses, it further defrauded her by failing to disclose she was buying in to an empty shell, and by continuing to deduct money from her bonuses after it had received the $500,000 for the buy-in, and it further converted Plaintiff's money and ownership interests to its own use and benefit.

150.    Further, Defendants appropriated approximately $400,000 from her bonuses in 2018 allegedly to buy back its assets from Methodist, and Plaintiff was not aware until this time that Defendant had previously sold its assets to Methodist, and in fact, that she had basically bought in to an empty shell and she would not have agreed to "buy-in" if she had been made aware Defendant, The West Clinic, had no assets.

151.   The Defendants made material misrepresentations of fact which were false.

152.   The Defendants made material omissions of fact which otherwise were not ascertainable by the Plaintiff, and said omissions were intentionally made.

153.   The Defendants made promises with no intent to keep the promises.

154.   The Defendants covered-up, concealed, and misrepresented the amounts it was deducting from Plaintiff's bonuses, despite having received significant amounts from the money paid by the Methodist University Hospital for Plaintiff's work RVU's.

155.   The Defendants covered-up, concealed, and misrepresented the methodology used in calculating Plaintiff's bonuses (and in calculating the bonuses of the other shareholders).

156.   The Defendants covered-up and concealed the fact that Plaintiff was "buying into" an empty shell.

157.   Despite the promises and representations to the contrary, Defendants did not compute the Plaintiff's bonuses the same as it did for other shareholders.

158.   The Defendants covered-up and concealed the fact that it was deducting more than the agreed upon $500,000 from her bonuses for her buy in, and Defendant converted this money to Plaintiff's great loss and detriment.

159.   The Plaintiff reasonably relied on the Defendants' representations and promises, to her detriment.

160.   The Defendant, The West Clinic, engaged in intentional, fraudulent, and willful misrepresentations and misconduct by failing to accurately inform Plaintiff, despite the duty to do so, the methodology of how bonuses were calculated, the actual amount of her bonuses, and the deductions made from her bonuses, and/or by providing false and/or misleading information to Plaintiff, by omitting material facts that were not ascertainable to the Plaintiff, flatly denying

22

information to Plaintiff, and/or by concealing information from Plaintiff.

161.   The representations of the CEO, Erich Mounce, were false, and Mounce's promises were made with no intent to keep.

162.   The Defendants concealed the money it was improperly deducting from her bonuses, and it failed, and otherwise refused to pay back to the Plaintiff the money it deducted from her bonuses for her "buy-in."

163.   As a result of the actions of Defendants, the Plaintiff has lost significant and substantial income, and she has otherwise been deprived of the use of her income.

164.   At all times material hereto, Defendants had exclusive control over any and all company finances and accounting records.

165.   Defendants used their position in the business arrangement to gain control and title over the property and finances that were owed to Plaintiff, otherwise breaching their fiduciary duties owed to Plaintiff, and then intentionally concealed records and information from Plaintiff, diverted and/or appropriated revenue that should have been paid to Plaintiff.

166.   The Plaintiff sues the Defendants for conversion, intentional misrepresentation, negligent misrepresentation, breach of fiduciary duties, negligence, fraud, breach of contract, fraud by omission, fraudulent concealment, promissory fraud, fraud, and embezzlement.

167.   The Plaintiff sues Defendants for a full and complete accounting and she requests that a constructive trust be imposed on all Defendants' assets to satisfy the amount that is found to be owed to her and for a resulting trust to be imposed.

168.   The actions of the Defendant were fraudulent, intentional, and reckless sufficient to justify significant punitive damages.

169.   Further, the cap on punitive damages is not applicable in this case because of

Defendants' fraudulent conduct and concealment of material records in an attempt to wrongfully evade liability.

## COUNT I  BREACH OF CONTRACT

170.    The allegations of Paragraphs 1 through 169 are herein incorporated by express reference.

171.    Plaintiff had a contract with the Defendants, that she would be paid a salary and bonuses calculated the same as the bonuses of the other shareholders, and she would be allowed to buy-in to The West Clinic, P.C. for $500,000, which would be deducted from her bonuses, and if she left employment of Defendant, The West Clinic, P.C. she would be paid the amount of her "buy-in".

172.    The Defendants breached the contract by deducting from her bonuses significantly more than $500,000.

173.    The Defendants breached the contract by refusing to pay her the amount she paid for the "buy-in" when she left the employment of The West Clinic, P.C.

174.    The Defendants breached the contract by not calculating the amount of her bonuses the same as the other shareholders.

175.    Further, the various operating agreements for the named Defendants specify how Plaintiff should be compensated for her ownership interests upon termination, and the Defendants failed to use these processes, but claimed Plaintiff has no ownership interests in further breach of contract.

176.    The Defendants breached the contract.

177.    Said breaches are material.

178.    As a result of Defendants' breach of the contract, the Plaintiff has suffered damages and losses as herein set forth.

179.    The Plaintiff therefore sue the Defendants for breach of contract, and she asks for an accounting, and appropriate evaluation of the subject entities.

## COUNT II   CONVERSION

180.    The allegations of Paragraphs 1 through 179 are herein incorporated by express reference.

181.    Defendants have misappropriated and converted Plaintiff's property to their own use and benefit without the Plaintiff's consent, including the excess money it was deducting from her bonuses, and its failure to repay the amount of her buy-in when she terminated her employment.

182.    Defendants intentionally exercised domain over Plaintiff's property in defiance of Plaintiff's rights to her great financial detriment, and she sues for conversion.

## COUNT III   NEGLIGENT MISREPRESENTATION

183.    The allegations of Paragraphs 1 through 182 are herein incorporated by express reference.

184.    The Defendants negligently misrepresented the terms of Plaintiff's buy-in to Defendant and the terms of her bonuses and/or her ownership interests in Defendants.

185.    The Defendants supplied faulty and/or inaccurate information to the Plaintiff regarding her buy-in, and regarding her bonuses.

186.    The Defendants failed to exercise reasonable care in obtaining and/or communicating the information to Plaintiff.

187.    The Plaintiff justifiably relied upon Defendants' representations to her financial detriment, and she sues for negligent misrepresentation.

## COUNT IV    INTENTIONAL MISREPRESENTATION

188.    The allegations of Paragraphs 1 through 187 are herein incorporated by express reference.

189.    The Defendants' CEO, Mounce, made false representations as alleged in the Complaint upon which Plaintiff relied.

190.    The Defendants' CEO, Mounce, knew or should have known that said representations were false, and he intended that the Plaintiff rely on said representations.

191.    The Plaintiff did not know that said representations were false, and she was justified in relying on the truth of said representations.

192.    As a result of Defendants' fraudulent conduct, the Plaintiff sustained the damages and losses herein described.

193.    The Plaintiff therefore sues Defendants for fraud.

## COUNT V    PROMISSORY FRAUD

194.    The allegations of Paragraphs 1 through 193 are herein incorporated by express reference.

195.    The Plaintiff avers that the Defendants' CEO, Mounce, made promises to the Plaintiff, as stated herein, and at the time said promises were made, the Defendants' CEO, Mounce, had no intention to perform them.

196.    The promises were made with the intent to deceive the Plaintiff and to induce the Plaintiff to rely upon them.

197.    The Plaintiff was unaware that the Defendants' CEO, Mounce, did not intend to perform said promises, and the Plaintiff was justified in relying upon said promises.

198.    As a result of the Defendant's promissory fraud, Plaintiff has sustained the damages and losses herein described.

199.    The Plaintiff therefore sues Defendants for promissory fraud.

## COUNT VI    FRAUDULENT CONCEALMENT

200.    The allegations of Paragraphs 1 through 199 are herein incorporated by express reference.

201.    At all material times, the Defendants' agents and employees, by reason of their knowledge, training, and expertise, were in a superior position over Plaintiff by virtue of their positions, and they had complete and total control over all financial information of the Defendants, and Plaintiff bestowed confidence and trust in Defendants' agents and employees to account for the same, but they were uncooperative and they withheld and concealed relevant information that Plaintiff was entitled to discover.

202.    At all material times, Defendants' agents and employees and Plaintiff were in a fiduciary relationship as members and shareholders and they owed Plaintiff an affirmative duty to disclose that Defendant was misappropriating the Plaintiff's bonus money, and they were concealing and misappropriating the bonus monies that should have been paid to Plaintiff.

203.    The Defendants failed to provide the Plaintiff written reports reflecting the breakdown of bonuses and how her bonuses (and the bonuses of the other shareholders) were being calculated, and Defendants otherwise discouraged Plaintiff from requesting details of how her bonuses were being calculated, and in fact, affirmatively concealed from Plaintiff the misappropriation of her bonuses, and the extent thereof, despite Plaintiffs' reasonable care and diligence.

204.     The Defendants were aware that the above-alleged fraudulent actions caused significant damages to Plaintiff, as herein described, and she sues for fraudulent concealment.

## COUNT VII  FRAUD BY OMISSION

205.     The allegations of Paragraphs 1 through 204 are herein incorporated by express reference.

206.     The Defendants made material omissions of fact in inducing the Plaintiff to agree to buy-in to The West Clinic.

207.     The material omissions of fact were known by the Defendants and were not ascertainable by the Plaintiff.

208.     The material omissions of fact were made with the intent to defraud the Plaintiff.

209.     Had the Plaintiff been informed The West Clinic, P.C. had no assets and that the shareholders had previously been paid out, she never would have agreed to the buy in.

210.     The Plaintiff therefore sues the Defendants for fraud by omission.

## COUNT VIII   CONSTRUCTIVE TRUST / RESULTING TRUST

211.     The allegations of Paragraphs 1 through 210 are herein incorporated by express reference.

212.     At all material times, the Defendants, had exclusive control over any and all company finances and accounting records Defendants.

213.     The Defendants' agents and employees used their positions in the business arrangement to control the financial information as it pertained to bonus calculations, and they otherwise breached their fiduciary duties, and intentionally concealed Plaintiff's bonus calculations from the Plaintiff (and the calculation of the other shareholders' bonuses), and they diverted and/or appropriated monies that should have been paid to Plaintiff.

214.    The Defendants diverted and/or misappropriated bonus monies that were supposed to be paid to the Plaintiff, and used it for said Defendants' own purposes, including distributing it to other shareholders to the loss and detriment of the Plaintiff.

215.    The Defendants procured monies owed to Plaintiff through the fraudulent scheme, wherein the Defendants intentionally misappropriated Plaintiff's bonus money in order to defraud and deprive Plaintiff to her great loss and detriment.

216.    This is a claim for disgorgement of illegal profits by which Defendants were unjustly enriched as a result of the Defendants' fraudulent actions as herein alleged, and the Plaintiff sues for a full and complete accounting of all revenues unlawfully obtained or retained by Defendants, and for disgorgement of all such funds, together with further equitable relief as may be just and proper, including that the Court declare a resulting trust on all assets acquired by Defendants  that were acquired with monies that should have gone to Plaintiff.

217.    The Plaintiff sues Defendants for a full and complete accounting and she asks that a constructive trust be imposed on all of the Defendants' assets to satisfy the amount that is found to be owed to her, and for a resulting trust to be imposed.

WHEREFORE, the Plaintiff prays for the following relief against all Defendants, both jointly and severally:

1.     For the Plaintiff, to be awarded compensatory damages;

2.     For the Plaintiff, to be awarded punitive damages;

3.     For an accounting and for an appraiser to be appointed to determine the value of the Plaintiff's ownership interests in the various entities.

4.     For the Court to impose a constructive trust and/or a resulting trust on the assets of the Defendants to pay any judgment Plaintiff is awarded in this case;

5.      For the Plaintiff to be awarded prejudgment interest;

6.      For the Plaintiff to be awarded reasonable attorney fees;

7.      For Plaintiff's costs of this action;

8.      For Plaintiff's to be awarded any other general relief as deemed appropriate by the

Court; and

9.      For a jury to try this case with issues joined.


RESPECTFULLY SUBMITTED this the 22nd day of December, 2021.


                                        THE BURKHALTER LAW FIRM, P.C.


                                        s/David A. Burkhalter
                                        David A. Burkhalter, II, BPR #004771
                                        D. Alexander Burkhalter, III, BPR #033642
                                        Zachary J. Burkhalter, BPR #035956
                                        Attorneys for Plaintiff
                                        111 S. Central Street
                                        P.O. Box 2777
                                        Knoxville, Tennessee 37901
                                        (865) 524-4974


                                        NORWOOD & ASSOCIATES


                                        s/Dan M. Norwood
                                        Dan M. Norwood, BPR #005926
                                        Attorney for Plaintiff
                                        2055 Cedar Bluff Drive
                                        Decaturville, TN 38329
                                        (901) 834-9292