# Exhibit A

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
 2                  WESTERN DIVISION
                     -    -    -
 3

         MOON FENTON, M.D.,     :  Case No.:  2:21-cv-02790-SHL-tpm
 4                              :
                   Plaintiff, :
 5                              :
             v.                 :
 6                              :
         THE WEST CLINIC, PLLC,:
 7       f/k/a THE WEST CLINIC,:
         PC, d/b/a WEST CANCER :
 8       CENTER, et al,         :
                                :
 9                 Defendants.:
10

                     -    -    -
11

                 November 7, 2022
12

                     -    -    -
13

14           Videotaped deposition of MOON
15       FENTON, M.D., taken pursuant to
16       Notice, held via Zoom, beginning at
17       approximately 10:05 a.m., before
18       Mary Hammond, a Registered
19       Professional Reporter and Notary
20       Public in the state of
21       Pennsylvania.
22                   -    -    -
23

24
```

Page 1

```
 1          A-P-P-E-A-R-A-N-C-E-S

 2

            BURKHALTER LAW FIRM, PC
 3          BY:  DAVID A. BURKHALTER, II, ESQUIRE
            111 S. Central Street
 4          P.O. Box 2777
            Knoxville, Tennessee  37901
 5          david@burkhalterlaw.com
            Counsel for Plaintiff
 6

 7          BLACK, McLAREN, JONES, RYLAND & GRIFFEE, PC
            BY:  MICHAEL McLAREN, ESQUIRE
 8          530 Oak Court Drive
            Suite 360
 9          Memphis, Tennessee  38117
            mmclaren@blackmclaw.com
10          Counsel for Defendant

11

12          Also Present:  Amy Worrell
                           Brenna Slalski
13                         Russ Strain, Videographer

14

15

16

17

18

19

20

21

22

23

24

                                          Page  2
```

```
1                         -    -    -

2                       I-N-D-E-X

3                         -    -    -

4          WITNESS:

5          MOON FENTON, M.D.

6                                      PAGE

7          BY MR. McLAREN          8

8          BY MR. BURKHALTER       --

9

10

11                        -    -    -

12                    E-X-H-I-B-I-T-S

13                        -    -    -

14           NAME              DESCRIPTION              PAGE

15         Exhibit 1    Notice of Deposition            11

16         Exhibit 2    Complaint                       11

17         Exhibit 3    Complaint, Bates Number         73
                        WEST012498 through WEST012517
18

           Exhibit 4    West Clinic Shareholders       108
19                      Meeting Minutes, Bates Number
                        WEST004292 through WEST007162
20

           Exhibit 5    Termination of Employment      292
21                      Agreement, Bates Number
                        FENTON000002
22

           Exhibit 6    Physician Employment Agreement 292
23                      Bates Number FENTON000051
                        through FENTON000073
24

                                          Page  3
```

```
 1                          -    -    -
 2              E-X-H-I-B-I-T-S - (Continued)
 3                          -    -    -
 4          NAME               DESCRIPTION                  PAGE
 5       Exhibit 7   Termination of Shareholders'           292
                     Agreement
 6
         Exhibit 8   (Not marked)                           292
 7
         Exhibit 9   Email Dated 7/21/20, Bates             292
 8                   Number WEST002422 through
                     WEST002423
 9
         Exhibit 10  Plaintiff's Answers to                 292
10                   Defendant's First Set of
                     Interrogatories
11
         Exhibit 11  Email Dated 7/17/14, Bates             292
12                   Number WEST012372
13       Exhibit 12  Email Dated 6/23/14, Bates             292
                     WEST000182 through
14                   WEST000189
15       Exhibit 13  (Not marked)                           293
16       Exhibit 14  Screenshot Dated 5/16/22,              293
                     Bates Number FENTON000020
17                   through FENTON000049
18       Exhibit 15  (Not marked)                           293
19       Exhibit 16  Letter Dated 4/24/20, Bates            293
                     Number FENTON000001
20
         Exhibit 17  (Not marked)                           293
21
         Exhibit 18  Pay Statement Dated 6/3/22,            293
22                   Bates Number WEST000038
                     through WEST000044
23
         Exhibit 19  1040 Tax Form, Bates Number            293
24                   FENTON000247 through FENTON000450
```

Page 4

```
1                   -   -   -

2            P-R-O-C-E-E-D-I-N-G-S

3                   -   -   -

4            (By agreement of counsel, the

5        sealing, certification and filing

6        are waived, and all objections as

7        to the form of the question, are

8        reserved until the time of trial.)

9                   -   -   -

10           THE COURT REPORTER:  The

11       attorneys participating in this

12       deposition acknowledge that I am no

13       physically present in the

14       deposition room, and that I will be

15       reporting this deposition remotely.

16           They further acknowledge that,

17       in lieu of an oath administered in

18       person, I will administer the oath

19       remotely.

20           The parties further agree that

21       if the witness is testifying from a

22       state where I am not a notary, that

23       the witness may be sworn in by an

24       out-of-state notary.
```

Page 5

1                    If any party has an objection

2          to this manner of reporting, please

3          state it now.

4                    Hearing none, we may proceed.

5                         -    -    -

6                    THE VIDEOGRAPHER:  We are

7          going on -- we are going on the

8          record.  Please stand by.

9                    Good morning.  We are now on

10         the record.  The time is

11         approximately 10:05 a.m., Monday,

12         November 7, 2022.

13                   Audio and video recording will

14         continue to take place, unless all

15         parties agree to go off the record.

16                   This is Media Unit 1 of the

17         video-recorded deposition of

18         Dr. Moon Fenton, M.D. taken by

19         counsel for the Defendant in the

20         matter of Moon Fenton, M.D. versus

21         The West Clinic, PLLC, et al, filed

22         in the US District Court for the

23         Western District of Tennessee,

24         Western Division, Case Number

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
1          Q.    Always from the time just before
2     you became a shareholder until the time you
3     left.  That's going to be my timeframe on
4     every question.
5          A.    Okay.
6                So from 2015 until 2020, and --
7     sorry, can you repeat the question that
8     you're asking?
9          Q.    Sure.
10               Do you have any letters other
11    than -- other than your 2014 letter of
12    resignation and -- and your letter to
13    terminating your shareholder status?
14         A.    There was a letter that I sent to
15    Dr. Tauer and Dr. Schwartzberg in 2014 but
16    not since 2015 to 2020.
17         Q.    Okay.  Okay.
18               In this lawsuit, I believe your
19    position is that you had a cap or a limit on
20    the -- what you call a buy-in of 500,000, and
21    then once you reached that cap you would be
22    fully vested, correct, is that your
23    allegation?
24         A.    No, that's not correct.  My
```

Page 20

1    allegation is that -- that we agreed on a

2    buy-in of $500,000, which would be deducted

3    from my bonuses over a five-year period,

4    starting with the year one of becoming a

5    shareholder, and that -- that I would have

6    that money back, and -- it would be a total

7    of $500,000, and that I would be treated

8    equally, like the other shareholders in

9    voting powers, as well as compensation,

10   model, and bonuses.

11       Q.    Okay.

12            Do you have anything in writing

13   from anybody at West that supports that

14   proposition?

15       A.    No, I do not have anything in

16   writing, but it's not because of my lack of

17   request of -- of that in writing.  I have

18   asked for that multiple times.  I was never

19   given that in writing.

20            That was an oral contract that

21   Erich Mounce and I had when I started working

22   at West, when I came down to interview at

23   West, rather, which was confirmed by

24   Lee Schwartzberg, and was made referenced to

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    prior to me becoming a shareholder.

 2         Q.    Okay.

 3               But you have nothing in writing to

 4    support that, correct?

 5         A.    Correct, because I was never given

 6    one, despite my asking multiple times.

 7         Q.    You don't have any write --

 8    anything in writing from you to West saying,

 9    for instance, "This will confirm that I'm

10    going to buy in at $500,000, and then it's

11    going to be refunded to me."

12               You never put that down in writing

13    anywhere before this Complaint, did you?

14         A.    Not in those words, but I did ask

15    for documentations or contracts or agreements

16    that would support our oral contract.

17         Q.    My question is a little bit more

18    pointed.

19               You never wrote down those terms in

20    any way, shape, or form, either for your own

21    benefit, or to send to West, correct?

22         A.    Not in those exact words that you

23    said, but in reference to our oral contract I

24    have referred to that, and -- and Erich and
```

Alpha Reporting                    800-556-8974
A Veritext Company               www.veritext.com

```
 1                    I -- I did not say that I -- I
 2            wrote down $500,000 in the words
 3            that you described, Mr. McLaren.
 4                    What I said was that, that was
 5            an -- it was assumed amongst us
 6            because we -- when we were talking
 7            to each other, that was an oral
 8            contract and they knew that.
 9                    So when I referred to buy-in,
10            that was in reference to what the
11            contract that I had with
12            Erich Mounce and Lee Schwartzberg.
13     BY MR. McLAREN:
14         Q.    Okay.
15                I just want to know if you ever
16     wrote West and included the -- the figure,
17     $500,000, until we got involved in this
18     lawsuit.
19         A.    No, there was nothing in writing
20     that I wrote specifically saying "$500,000
21     buy-in" in writing, but in -- in
22     communication, the oral communications, you
23     know, that -- that $500,000 was discussed
24     multiple times.
```

Page 24

1            Doctor, my question before the
2    technical glitches was:  Tell me all part of
3    this oral contract.
4         A.   Okay.  So I was told that there
5    would be a $500,000 buy-in to a valuable
6    company, which will be taken out of my bonus
7    over a five-year period, and that I would
8    have that money back when I left the company.
9            And that -- the other important
10   part was that we would -- I would be treated
11   same and equally, like the other shareholders
12   in my compensation and in my voting powers.
13        Q.   Okay.
14           And none of this was in writing.
15           It was all oral, right?
16        A.   It was, correct.
17        Q.   And it was through an oral contract
18   for a five-year term, correct?
19        A.   Because they did not produce me
20   with a written contract because -- even
21   though I asked multiple times, so, correct.
22        Q.   That's correct.  It was an oral
23   contract to cover five years, right?
24        A.   It was an oral contract that --

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

1              MR. McLAREN:  Okay.  We're

2        frozen again.

3              THE VIDEOGRAPHER:  Off the

4        record at 11:14.

5                   -   -   -

6              (Whereupon, there was a brief

7        recess held off the video record.)

8                   -   -   -

9              THE VIDEOGRAPHER:  One

10        moment -- moment.  We'll go back

11        on.

12              Back on the record at

13        a.m.

14                   -   -   -

15              (Back on the video record.)

16                   -   -   -

17   BY MR. McLAREN:

18        Q.   Okay.

19              Doctor, can you hear me?

20        A.   Yes, I can.

21        Q.   Okay.

22              So I want to make sure I've all of

23   this correct, and I'll restate what I believe

24   you told me.

Page 67

```
 1              That to become a shareholder
 2    employee of West, you would pay a $500,000
 3    buy-in to a valuable company over five years,
 4    and you would be treated the same or equally
 5    as the other shareholders with respect to
 6    bonus and salary calculations; I am right
 7    about that?
 8         A.    Compensation model.
 9         Q.    Compensation model, okay.
10         A.    Yes.
11         Q.    Am I right about that?
12         A.    Yes.  And that I would get a
13    $500,000 buy-out.
14         Q.    And you would get your $500,000
15    back?
16         A.    Yes.
17         Q.    And this was an oral contract that
18    would take a few years to -- well, five years
19    to complete, correct?
20         A.    It would begin, right, when I
21    became a shareholder and end when that
22    $500,000 was reached.
23         Q.    Okay.
24              But it -- what was your five
```

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
 1    years -- it was going to be a buy-in over a
 2    five-year period, right?
 3         A.   That's -- that would be the
 4    timeframe when they would take the buy-in out
 5    from my bonuses.
 6         Q.   Okay.
 7              So it was going to be performed
 8    over a five-year period, correct?
 9         A.   Correct.
10         Q.   Okay.
11              And there's nothing in writing that
12    outlines those terms, correct?
13         A.   Correct.
14         Q.   Okay.
15         A.   Despite my asking.
16         Q.   I'll keep saying what I say, and
17    you keep saying what you say.
18              Okay.  All right.
19              Now, look at Paragraph 25.
20         A.   (Witness complies.)
21              Yes.
22         Q.   This says your cost of the buy-in
23    would be 500,000.
24              Do you know how this was to be
```

Page 69

1    time as a shareholder.

2              I would have a better understanding

3    and be able to answer your question once I

4    have seen all of those.  I don't know what my

5    ownership of the company's value is.  I don't

6    know the value of the company.

7              So all of those have to be provided

8    to me before I can answer your question

9    correctly.

10        Q.   Okay.

11             I think I'm not talking about your

12   attorney, but my question is just as to

13   bonuses.

14             Your oral contract was 500,000 cap

15   on your bonuses, correct?

16        A.   That's correct.

17        Q.   Okay.

18             And you recognize that West

19   disputes that, that they say there was no

20   oral contract, correct?

21        A.   Right.

22        Q.   Okay.

23        A.   They're -- they're disputing that

24   there's an oral contract, and they took out

1    more than what they promised they would take

2    out.

3          Q.    Okay.

4                So the rest of your oral contract

5    was you would be paid back when you left

6    West, correct?

7          A.    That's correct.

8          Q.    And that would be if you left West

9    for any reason anytime, correct?

10         A.    That's correct.  As long as I have

11   been a shareholder to a point where they took

12   out the $500,000, then that would be my

13   buy-in, and that would be my buy-out.  It was

14   a simple contract.

15               There wasn't a whole lot of hand

16   waving or -- or my reason to -- to ask, you

17   know, or -- or really be suspicious.

18               It was a simple contract.  There's

19   a 500,000 buy-in, and there's a $500,000

20   buy-out.

21         Q.    But you're claiming the Complaint

22   is also there were percentages per year,

23   correct?

24         A.    Right.  That they would use that to

```
 1    cap up to $500,000.
 2         Q.    Did Erich Mounce tell you that?
 3         A.    Did Erich Mounce tell me what?
 4         Q.    About the 80, 60, 40, 20.
 5         A.    He did.
 6         Q.    Okay.
 7               So remember I asked you:  Tell me
 8    all parts of the oral contract.
 9               That's another part of the oral
10    contract, that there would be an 80, 40 --
11    80, 60, 40, 20, percent buy-in, correct?
12         A.    Until my $500,000 were met,
13    correct.
14         Q.    Right.
15               Are there any other parts of that
16    oral contract?
17               I want to make sure I've got all of
18    the things that you think was orally
19    contracted to, are there any other parts?
20         A.    It was a -- it was a simple
21    contract.  It would be deducted out of my
22    bonuses up to $500,000 in a depreciating
23    factor, and that was -- that was the main
24    component.  There will be a buy-out.  I will
```

Page 84

1   be treated equally in -- in the compensation

2   model, and the voting powers.

3        Q.   Okay.

4            I just want to make sure because

5   you didn't mention the 80, 60, 40, 20 when I

6   asked you to describe all parts of the oral

7   contract.

8        A.   I may have mentioned it prior to

9   that, so that's my mistake.

10       Q.   Okay.

11       A.   I can try to repeat myself, yeah.

12       Q.   Okay.

13            And, as we sit here today, you

14  don't know of any partner who's ever left

15  West who got a refund of their -- using your

16  term "buy-in money," do you?

17       A.   I am not privy to the contracts of

18  any of the shareholders who left or who

19  bought in and what kind of deal that they

20  have individually with Kurt Tauer,

21  Lee Schwartzberg, and, at the time,

22  Erich Mounce --

23       Q.   Right.  I get that.

24            I just want to make sure you don't

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1     '13, '14, '15, didn't you?
 2          A.   No, I did not.
 3          Q.   Okay.
 4          A.   That was not privy to me, and that
 5     no one shared with me.
 6          Q.   Okay.
 7               So when you became a shareholder
 8     even, you didn't know that West had sold its
 9     assets to Methodist, did you?
10          A.   No, I did not know that.
11          Q.   Did you attend shareholder meetings
12     throughout --
13          A.   Yeah.
14          Q.   Let me finish -- throughout 2015,
15     '16, '17, and '18?
16          A.   Yes.
17          Q.   And are you telling the jury that
18     that topic, the fact that Methodist had
19     bought the assets of West, never came up in
20     any shareholder meetings?
21          A.   That's correct.
22          Q.   So if there are shareholder minutes
23     that reflect lengthy discussions about buying
24     back the assets from Methodist, is it your
```

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
 1    testimony that you weren't aware of that?
 2         A.   That is correct.  We talked about
 3    buying back the assets when the -- there were
 4    talks of dissolution of the contract with
 5    Methodist.  That's the first time that I
 6    heard that West had sold its assets, not
 7    before.
 8         Q.   Okay.
 9              So you were present at shareholder
10    meetings as early as 2016 when West was
11    discussing buying back their assets, correct?
12         A.   I do not recall a shareholder
13    meeting in 2016 that they talked about buying
14    back assets.
15         Q.   What's the first shareholder
16    meeting that you recall when they talked
17    about buying back their assets?
18         A.   That was when there was a lot of
19    discussion about coming out of that contract
20    with Methodist, and that we would have to buy
21    back the buildings and the assets.
22         Q.   My question was --
23         A.   -- so it was around 2018.
24         Q.   2018 is your best remembrance?
```

Page 95

1          A.   In around 2018 is when that

2     discussion started to happen.

3          Q.   Okay.

4               Get to Paragraph 34, if you will.

5          A.   (Witness complies.)

6               Okay.

7          Q.   It says at the time you agreed to

8     buy in the fact that West had sold its assets

9     and that shareholders had been paid

10    significant payouts was not ascertainable by

11    the plaintiff.

12               When did you learn about that?

13         A.   It was towards my exit, after I had

14    resigned, and I was in the process of, you

15    know, winding down my clinic.

16               I shared a close proximity office

17    with Dr. Gary Tian, at which time he told me

18    that West had sold its assets to Methodist,

19    at which time they all received moneys when

20    Methodist bought those assets and the

21    building and that it was shared amongst the

22    shareholders.

23         Q.   Okay.

24               I'm a little bit confused because

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

```
 1    didn't ask.  I was never produced any.
 2         Q.    Okay.
 3               I'm just looking for a document,
 4    Doctor.
 5               I'm looking for your first
 6    shareholder meeting attendance; do you
 7    remember the date?
 8         A.    It's either February or March.  I
 9    can't recall exactly my first shareholder
10    meeting.  I -- I know for a fact that it was
11    not January.
12                    MS. STERLING:  Mike, I think
13               you're looking for Exhibit-14.
14               MR. McLAREN:  Yeah, I've been
15               looking at 15.  Thank you, Amy.
16                        -   -   -
17               (Whereupon, Exhibit-4, West
18               Clinic Shareholders Meeting
19               Minutes, Bates Number WEST004292
20               through WEST007162, was marked for
21               identification.)
22                        -   -   -
23    BY MR. McLAREN:
24         Q.    February 25th, 2015, was your -- it
```

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

```
 1   looks like -- your first meeting as a
 2   shareholder.
 3            Is that consistent with your
 4   memory?
 5       A.   Well --
 6       Q.   And let me get you -- let me read
 7   to you a portion of the minutes.
 8            Dr. Tauer and Schwartzberg --
 9   "Dr. Tauer welcomed Dr. Moon Fenton to the
10   meeting as a new shareholder of The West
11   Clinic."
12            So would that have been your first
13   meeting?
14       A.   Yes.
15       Q.   Okay.
16            And at that meeting, you had not
17   ever signed a shareholder agreement, correct?
18       A.   Correct, I have never seen one.
19            MR. McLAREN:  Okay.  And this
20            is going to be made the next
21            exhibit in this deposition, but
22            it's Exhibit-14.
23   BY MR. McLAREN:
24       Q.   And it says that Ron Davis -- do
```

Page 109

1    you know who he was, Doctor?

2         A.   Yes.  He was the CFO.

3         Q.   Okay.

4              And the -- and the minutes reflect

5    that he reviewed the financial status of the

6    company for the month of January 2015, and

7    year-to-date 2015 and then it's got a bunch

8    of numbers, statistics.

9              Do you recall him presenting the

10   financials for West Clinic?

11        A.   Yes.  He did that as a standard.

12        Q.   Okay.

13             Do you remember whether you asked

14   any questions about that?

15        A.   I didn't know what questions to

16   ask.  There were no questions from anybody

17   else.  I do recall that those financials were

18   up on a -- a slide, on a PowerPoint, and we

19   looked at it while we were having dinner.

20             I recall there was no discussion of

21   what individual physicians made, or any

22   reference to any buy-in, buy-out, or any of

23   that sort of thing.

24        Q.   Okay.

Page 110

1    David may know that better than I.  I don't
2    know if I am or not, because I've never
3    had -- we never reached a termination
4    agreement.
5         Q.    Right.  Yeah.
6              Now, Paragraph 120 says that you
7    were never provided with a report or other
8    documents that stated the total amount of
9    bonuses that Plaintiff earned, or that showed
10   and/or explained the deductions that
11   Defendant made.
12             You did have meetings with
13   Erich Mounce, didn't you?
14        A.    I had a -- I had a phone call
15   meeting.  It was a phone meeting with
16   Erich Mounce, and I can check the dates, but
17   I did, and we did go over -- I did ask him to
18   give me an idea of how my bonuses were
19   calculated, yes.
20        Q.    Did he give you what he called a
21   cheat sheet, and go over it with you showing
22   in detail precisely how your bonus was
23   calculated; do you remember that term that he
24   used in one of the emails that you furnished

                                    Page 168

```
 1    a cheat sheet?
 2         A.   He did, but he never furnished me
 3    with that cheat sheet.
 4         Q.   You didn't sit down and talk with
 5    him about your bonus calculations?
 6         A.   I sat down and talked with him over
 7    the phone, not face-to-face about how my
 8    bonus was calculated, and I jotted it down on
 9    a piece of paper, as you ran through those
10    numbers.
11              And then there's a follow-up email
12    for -- I don't know if that was the same
13    time.  I think that there was one maybe
14    another time that I asked him about that,
15    because, yeah, again, I mean, you know, that
16    was sort of a recurring theme, me asking him
17    to give me some explanation and some
18    documents.
19              But to answer your question, did I
20    ever been given a cheat sheet, no, I had
21    never been given a cheat sheet.
22         Q.   You were never given an Excel
23    spreadsheet that showed your compensation?
24         A.   Not that I can recall.  I -- I
```

Page 169

```
 1    Exhibit-9 of your Complaint, and it's
 2    attached --
 3                 MS. STERLING:  Mike, I think
 4           that is in our -- our Exhibit-13, I
 5           believe.
 6                 MR. McLAREN:  Is it 13?
 7                 ATTORNEY#5:  Our Exhibit-13,
 8           not hers.
 9                 MR. McLAREN:  Yes, yes.
10                 ATTORNEY#5:  Our premarked 13.
11                 MR. McLAREN:  Yes.
12                 MR. BURKHALTER:  All right.
13           She has that.
14                 MR. McLAREN:  Okay.  It's
15           called WEST00423.
16    BY MR. McLAREN:
17         Q.   This is you -- look at the email --
18                 MR. McLAREN:  And I want to
19           make this the next exhibit, this
20           email, and the attachment.
21    BY MR. McLAREN:
22         Q.   This is an email from you to Mitch
23    Graves, correct?
24         A.   Correct.
```

Page 215

1          Q.    And you found this attachment in
2     your desk drawer, correct?
3          A.    Yes, that's correct.
4          Q.    And it references 2016 bonus
5     calculation?
6          A.    Correct.
7          Q.    And in 2016, you learned that --
8     well, according to your email, that you paid
9     448,000 in 2016, correct?
10         A.    Correct.
11         Q.    And that doesn't account for what
12    you paid in -- in 2015, correct?
13         A.    Yeah.  I wasn't quite sure what I
14    paid in 2015.
15         Q.    So you knew on -- in 2016, what you
16    had paid in totaled over $500,000, correct?
17         A.    That's correct.
18         Q.    Okay.
19               And yet you continued to be a
20    shareholder in 2017, 2018, 2019, into 2020,
21    correct?
22         A.    Yes.  So 2016 is what I know was
23    taken out of my -- as for a buy-in.  In 2015,
24    2017, 2018, I was never given any

                              Page 216

```
 1          A.   Yes.  You asked me about 2017.
 2          Q.   Oh, I'm sorry.  I thought I'd ask
 3     you about 2016.  In 2016 --
 4          A.   That's why -- yes.
 5          Q.   Let's start over.  I made a
 6     mistake.
 7               In 2016, you knew exactly how much
 8     you had paid in for what you call your
 9     buy-in, correct?
10          A.   Yes.
11          Q.   Okay.
12               So with respect to Paragraph 158,
13     the defendants didn't cover up anything about
14     calendar year one -- 2016, did they?
15          A.   Not for that year because I asked
16     for that.
17          Q.   Okay.
18          A.   I also asked for that on other
19     years.  I just didn't get it.
20          Q.   Okay.
21               Let's go to your Answers to
22     Interrogatories.
23          A.   You have the Answers to
24     Interrogatories.
```

Page 232

1          So you had a conference with Erich,
2     Kurt Tauer, and Lee Schwartzberg about your
3     bonus at year-end 2016, did you?
4          A.   I guess I did.  I can't recall that
5     meeting, but part of this email, that it
6     seems so I did.
7          Q.   Okay.
8               I mean, your recollection would be
9     better in 2016 than your recollection now in
10    2022, correct?
11         A.   I would agree, yes.
12         Q.   Okay.
13              Do you remember any other details
14    of that meeting between you, Kurt Tauer, and
15    Lee Schwartzberg, other than the fact that
16    they told you what your bonus would be close
17    to?
18         A.   I don't recall.
19         Q.   And he -- and you say -- you
20    reference your first year bonus, and you
21    reference that you want to know an
22    explanation of the breakdown of your bonus,
23    correct?
24         A.   Yes.

Page 259

1          Q.   And Mr. Mounce responded to you --
2     well, now, did you -- and he said in his next
3     email back to you the same day, three hours
4     later, "For our discussion."
5               Is that where you got this note
6     where you calculated what your bonus was?
7          A.   I'm trying to understand this
8     four-hour discussion.
9          Q.   Yeah, I'm suggesting --
10         A.   Yeah, pertains to --
11         Q.   I'm suggesting to you that there
12    was a something attached to that email; do
13    you recall any of this?
14         A.   No, I cannot recall.
15         Q.   Okay.   Okay.
16              So let's go to Page 187.
17         A.   (Witness complies.)
18         Q.   And you said, "Thanks for meeting
19    with me last Thursday."
20              So it looks like a month after you
21    met with Erich, Kurt, and Lee, you had a
22    reference to that meeting.   Another meeting
23    would be a second meeting because it was over
24    a month later.

Page 260

```
 1                    Do you see that?
 2         A.   No, sir.  So, you know, this is --
 3    this is -- let me just finish.  This is
 4    confusing because your email timeline is
 5    backwards.
 6              So to your question in Page 186,
 7    you know, where it says, "Erich Mounce" --
 8    the email says, "P.S. Dr. Fenton, please call
 9    me or ask Jenny to set up a time."
10              And I told you I must have done
11    that.  I recall doing such.  Now, the
12    followup to December 23rd is the
13    January 23rd, 2016, and I referred to a
14    meeting.  Do you see that, December 23rd,
15    2015?  And that the next email I send in is
16    January 23, 2016, so that is, what, roughly
17    about a month later.
18              I say, "Thank you for meeting with
19    me last Thursday."
20              So there must have been an email
21    that I sent to Jenny and that Erich and I
22    met, and I have a -- follow-up questions that
23    I'm asking him, which he's answering at the
24    top of -- of that -- that email page.
```

Page 261

```
 1          Q.    Okay.
 2                Let's -- if we could --
 3          A.    Can you see that?
 4          Q.    Let's, if we could --
 5          A.    And then what you're referring to
 6    is -- you -- you know, you're looking at a
 7    timeline of over a year, December 23, 2016,
 8    you know, that's a year later.
 9          Q.    Let's do this.
10          A.    January of 2016, that's 12 months
11    apart.
12          Q.    Yes.
13                Let's, if we could, start over on
14    this, okay --
15          A.    Okay.  Let's do that.
16          Q.    -- because email threads are always
17    confusing.
18          A.    Yeah.
19          Q.    And December -- on Page 186,
20    Mr. Mounce told you what your bonus was going
21    to be, 20,000, plus, right?
22          A.    Yes.
23          Q.    And that's -- December 23rd, 2015,
24    you knew to the penny what your bonus was
```

Page 262

```
 1    going to be, correct?
 2         A.    Yes.
 3         Q.    And Mr. Mounce suggested that you
 4    call him or Jenny to set up a time to meet,
 5    correct?
 6         A.    Yes.
 7         Q.    And within a month of that you had
 8    met with Mr. Mounce, if you look at Page 187,
 9    correct?
10         A.    Correct.
11         Q.    Okay.
12               You had met with him at the prior
13    Thursday, correct?
14         A.    Correct.
15         Q.    And you said that -- well, so what
16    you said earlier about never meeting with him
17    is probably wrong.
18               You probably misstated, correct?
19         A.    Well, I mean, I met with him
20    multiple times over the course.  Did I meet
21    with him to talk about my bonus, you know, I
22    didn't have a quite clear recollection,
23    except that phone conversation because I kept
24    a note for myself.
```

Page 263

```
 1              But after looking at these emails,
 2    yeah, I have met with him on that one
 3    Thursday after shareholder meeting.  So, to
 4    your point, yes, there was this -- this one
 5    incident that we did meet.
 6         Q.    Okay.
 7              So you say, "Thanks for meeting
 8    with me last Thursday.  It was very helpful
 9    to talk with you about compensation model,
10    which I had no clue before the meeting.
11    After having set the time to process the
12    information, I have a few follow-up
13    questions."
14              And then you said, "Was the 2015
15    year-end bonus calculated on the model, based
16    on the model we discussed?"
17              So you recall now having discussed
18    the compensation model with Mr. Mounce in
19    January of 2016, correct?
20         A.    I'm sorry, can you ask that
21    question again?
22         Q.    Sure.
23              You say, "Was the 2016 year-end
24    bonus calculated based on the model we
```

Page 264

```
 1    discussed?"

 2           So you discussed the compensation

 3    model with Mr. Mounce, correct?

 4        A.    Yes, yes.

 5        Q.    Okay.

 6           And then you say in Number 3, "How

 7    much of the bonus was allocated with a

 8    buy-in, and is this the same amount for the

 9    next four years?"

10           And that's in January of 2016,

11    correct?

12        A.    Correct.

13        Q.    Okay.

14           So you discussed that with

15    Mr. Mounce in January of 2016, correct?

16        A.    Correct.

17        Q.    Okay.

18           And he responds and he says that he

19    has "a one-page cheat sheet I have developed

20    for you."

21           And he says, "No one has ever asked

22    before, and we never provided to a non-fully

23    vested shareholder."

24           Do you remember getting that email?
```

Page 265

1    you were not fully into the company yet?

2        A.   I -- I have not yet contributed

3    $500,000 into the company yet.  That's --

4    that's my interpretation.

5        Q.   Okay.

6             Now, go the next page, 188.

7        A.   (Witness complies.)

8             Okay.

9        Q.   And you get an email from Eric

10   Mounce, December 23, 2016, telling you the

11   precise dollar amount of your year-end bonus,

12   correct?

13       A.   Yes.

14       Q.   And you responded about why it's

15   not 600,000, correct?

16       A.   Right.

17       Q.   And you wanted to know the

18   breakdown of your bonus.

19             Now, go back to Exhibit-9 of the

20   Complaint, which has your handwritten notes

21   with an exact breakdown of your bonus.

22       A.   (Witness complies.)

23       Q.   Do you see that?

24       A.   That was --

Page 269

```
1                    MR. BURKHALTER:  Did I catch

2             that email?

3                    THE WITNESS:  It's not -- the

4             email -- you're talking about

5             sticky note that I had handwritten?

6                    MR. McLAREN:

7     BY MR. McLAREN:

8         Q.   I don't know if it's a sticky note

9     or not.  I don't know.

10        A.   Can you hold it up, if you have,

11    just show me what you're referring to?

12                   MR. BURKHALTER:  It's

13            Exhibit-13 to your production,

14            Exhibit-13?

15                   THE WITNESS:  Yes.

16                   MS. STERLING:  Yes.  It's our

17            premarked Exhibit-13.  Yes, that is

18            correct.

19                   MR. McLAREN:  Okay.

20    BY MR. McLAREN:

21        Q.   So that's after a conversation with

22    Erich Mounce that you wrote down about your

23    2016 exact breakdown of your bonus

24    calculation, correct?
```

Page 270

1        A.    Yes.

2        Q.    And this is in your handwriting,

3   right?

4        A.    Yes.

5        Q.    So you knew in December 2016 or

6   January 2017 that 40 percent had been

7   deducted from your bonus.

8             Do you see that that's your

9   handwriting, "40 percent"?

10       A.    Yes.

11       Q.    So does that refresh your

12   recollection that Mr. Mounce told you that

13   your bonus would be vesting or paying at 100

14   percent, 80 percent, 60 percent, 40 percent

15   each year, on a yearly basis?

16       A.    No.   There was never a vesting

17   schedule of 80, 60, 40, 20.

18       Q.    Okay.

19       A.    There was a reference made in that

20   that's -- that can be done to -- until I

21   reach the maximum of $500,000, that it would

22   be in a grading fashion where each year I

23   would be making more, that as I became a more

24   senior shareholder, that I would retain more

                                    Page 271

```
 1    David Burkhalter

 2    david@burkhalterlaw.com

 3                        November 28, 2022

 4    RE:   Fenton, M.D., Moon v. The West Clinic, PLLC, Et Al

 5          11/7/2022, Moon Fenton , M.D. (#5560053)

 6          The above-referenced transcript is available for

 7    review.

 8          Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12          The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    errata-tx@veritext.com.

16

17     Return completed errata within  30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

                                          Page 296
```

1   Fenton, M.D., Moon v. The West Clinic, PLLC, Et Al

2   Moon Fenton , M.D. (#5560053)

3            E R R A T A   S H E E T

4   PAGE __45__ LINE __18__ CHANGE __Mouse to Mounce__

5   _____

6   REASON __spelling__

7   PAGE __52__ LINE __1__ CHANGE __Yes, I did.__

8   _____

9   REASON __change tense to past tense.__

10  PAGE __54__ LINE __8__ CHANGE __Dr. Joe Santoso__

11  _____

12  REASON __name spelled incorrectly__

13  PAGE __55__ LINE __6-7__ CHANGE "As a shareholder at that

14  time, I wasn't dealing with buy-out of other people

15  REASON who were leaving" - Clarification -

16  PAGE __59__ LINE __16__ CHANGE __"... became__

17  __One Oncology"__

18  REASON __correction__

19  PAGE __63__ LINE __9__ CHANGE __omit "second"__

20  _____

21  REASON __wrong/inappropriate/mis-spoke__

22

23  _____    12/12/22

24  Moon Fenton , M.D.           Date

25

                                 Page 297

1    Fenton, M.D., Moon v. The West Clinic, PLLC, Et Al

2    Moon Fenton , M.D. (#5560053)

3              E R R A T A   S H E E T

4    PAGE _75_ LINE _5_ CHANGE _28% to 20%_

5    _____

6    REASON _Correction_

7    PAGE _84_ LINE _5_ CHANGE _"He did, as an example"_

8    _____

9    REASON _clarification_

10   PAGE _99_ LINE _11_ CHANGE _reason to region_

11   _____

12   REASON _Correction of wording_

13   PAGE _145_ LINE _4_ CHANGE _"key Tom" to Qui Tam_

14   _____

15   REASON _correction - wording_

16   PAGE _146_ LINE _13_ CHANGE _KEY 6 tampering to_

17   _Qui Tam_

18   REASON _Correction - wording_

19   PAGE _146_ LINE _21_ CHANGE _UPNC to UPMC_

20   _____

21   REASON _correction - word_

22

23   _____        _12/12/2~_

24   Moon Fenton , M.D.                        Date

25

                                        Page 297

Fenton, M.D., Moon v. The West Clinic, PLLC, Et Al

Moon Fenton , M.D. (#5560053)

E R R A T A   S H E E T

PAGE _166_ LINE _15_ CHANGE _physician → patients_

_____

REASON _wrong word_

PAGE _172_ LINE _3_ CHANGE _"..he.." to " you"_

_____

REASON _wrong quotation / reference_

PAGE _184_ LINE _21_ CHANGE _now → new_

_____

REASON _wrong word_

PAGE _195_ LINE _7_ CHANGE _reviews → RVUs_

_____

REASON _wrong word_

PAGE _201_ LINE _22_ CHANGE _Omit "people's"_

_____

REASON _Confusing_

PAGE _201_ LINE _23-24_ CHANGE _Omit last sentence_

_"I mean, I'm sorry, all the other people's hard work RVUs."_

REASON _Confusing_

_____        _12/12/22_

Moon Fenton , M.D.                              Date

Page 297

Alpha Reporting                    800-556-8974
A Veritext Company              www.veritext.com

Fenton, M.D., Moon v. The West Clinic, PLLC, Et Al

Moon Fenton , M.D. (#5560053)

E R R A T A   S H E E T

PAGE _205_ LINE ___11___ CHANGE __omit "8"_____

_____

REASON __No meaning/purpose_____

PAGE _207_ LINE _6-7_ CHANGE __to "assess fair____

__market value "_____

REASON ___clarification_____

PAGE _213_ LINE _12_ CHANGE __valued → evaluated__

_____

REASON ___clarification of wording___

PAGE _216_ LINE _17_ CHANGE __"That's correct" to__

__"I had a suspicion"._____

REASON ___Clarification_____

PAGE _225_ LINE _22_ CHANGE __UP → UT_____

_____

REASON __misspelling_____

PAGE _229_ LINE _5_ CHANGE __weren't → worked_____

_____

REASON __wrong word_____

_Moon Fenton signature_____     12/12/22_____

Moon Fenton , M.D.                             Date

Page 297

1    Fenton, M.D., Moon v. The West Clinic, PLLC, Et Al

2    Moon Fenton , M.D. (#5560053)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Moon Fenton , M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____          _____
                                        12/12/22
12   Moon Fenton , M.D.                  Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____ DAY OF _____, 20___.

16

17

18              _____

19              NOTARY PUBLIC

20

21

22

23

24

25

                                        Page 298

# Exhibit B

| From: | Erich Mounce |
| To: | Moon Fenton |
| Subject: | Year End |
| Date: | Wednesday, December 23, 2015 2:39:18 PM |

Hi Dr. Fenton:

Thank you for another amazing year with the West Clinic and Cancer Center. Your 4th quarter bonus is $20,632.17.

Please remember that these payments are made via hard checks that are cut and dated in December and manually handed out the first week of January.

Please feel free to contact Bonnie Legg with any changes or tax withholding questions no later than Monday December 28th.

Thank you so much for all you do for our patients and the West family.

Erich


PS  Dr. Fenton, please call me or ask Gennie to set up a time if you want to go over the model in person.



Erich Mounce
Chief Executive Officer
UT West Cancer Center

100 North Humphreys Blvd.
Memphis, Tennessee 38120

901-683-0055  Ext 1383
901-481-2475  Mobile

EMounce@westclinic.com

CONFIDENTIAL  WEST000186

| | |
|---|---|
| **From:** | Erich Mounce |
| **To:** | Moon Fenton |
| **Subject:** | RE: follow up questions |

Hi Moon.  I have a one page cheat sheet I have developed for you.  I need to make sure it is ok with Drs. Tauer and Schwartzberg. We have never provided the total model calculation before to a non-fully vested shareholder.   There is no historical reason for that, no one has ever asked and I just want to make sure they are ok with it.

The cheat sheet will show what you got as your base draw, what the total model generated for you was, then your buy in and any other small changes etc..

I should know by tomorrow.

Thanks

Erich

---

**From:** Moon Fenton
**Sent:** Saturday, January 23, 2016 10:32 AM
**To:** Erich Mounce
**Subject:** follow up questions

Hi Erich,

Thanks for meeting with me last Thursday.  It was very helpful to talk with you about compensation model, which I had no clue before the meeting.  After having some time to process the information, I have a few follow-up questions.

1.  Was the 2015 year-end bonus calculated based on the model we discussed?
2.  If so, then how much of the $20,000 was calculated from the 25% "education" piece?
3.  How much of the bonus was allocated to the buy-in and is this the same amount for the next 4 years?

Thanks again!

Moon

| | |
|---|---|
| **From:** | Erich Mounce |
| **To:** | Moon Fenton |
| **Subject:** | RE: Year End Payment / Bonus |
| **Date:** | Friday, December 23, 2016 12:41:13 PM |
| **Attachments:** | Moon Fenton Pay review 2016.xlsx |

For our discussion

**From:** Moon Fenton
**Sent:** Friday, December 23, 2016 9:54 AM
**To:** Erich Mounce
**Subject:** Re: Year End Payment / Bonus

Erich,

My last conversation with you, Kurt, and Lee was that my bonus will be near $600,000 considering my RVUs will be near 9,000.
My current RVU surpasses that so I'm not sure why my bonus is less than half of projected.

My first year shareholder bonus was about $20,000 despite my participation in teaching, meetings, and tumor conferences. I understand that I was on a maternity leave that year but I did my full load of rounding, weekend and holiday calls and generated over 5000 RVUs.

Please explain the breakdown of my bonus for me so that I do not feel unfairly compensated.

Sincerely,
Moon

Sent from my iPhone

On Dec 23, 2016, at 9:17 AM, Erich Mounce <emounce@WESTCLINIC.com> wrote:

> Dr. Fenton:
>
> On Wednesday December 21st, the West Clinic Shareholders approved the final year end distribution and bonus allocations for each oncology discipline. Each allocation amount has been processed through each disciplines compensation model. As the result of another amazing year and your hard work, you will receive a yearend bonus in the amount of $258,898.00. Your yearend total compensation shall be approximately $808,898.49. There may be some variance due to rounding in the model, so please await your W-2 for final year end paid amounts.
>
> The payment will be paid via a "hard live check" and will be dated December 28th or 29th of December 2016. The checks will be available for distribution beginning the week of January 4th 2017. Should you have any special requests

CONFIDENTIAL  WEST000188

with regard to tax withholdings or other payment processes, please contact Bonnie Legg directly.

As always, thank you for your commitment and service to our patients and our associates

Erich


**Erich Mounce** | Chief Executive Officer
West Cancer Center
7945 Wolf River Blvd
Memphis, TN 38138
Phone: 901-683-0055 ext. 61383 | Mobile: 901-481-2475
westcancercenter.com | 901.683.0055

<image003.jpg>

CONFIDENTIAL  WEST000189

**Moon Fenton**

2016 Pay per formula:

| Total Generated | Productivity | Quality / Metrics | Education / Teaching |
|---|---|---|---|
| **1,257,243.91** | $ 805,710.91 | $ 301,265.00 | $ 150,268.00 |

Model is Total Generated (less) Base of $510,000 =   $ 747,243.91

Times 40%   $ 298,897.56  Thus you get this % of your bonus since this is your second year and it is a buy in of 20% per yea

| | |
|---|---|
| Thus Base | $ 510,000.00 |
| Bonus | $ 298,897.56 |
| Total Due | $ 808,897.56 |
| Paid to Date | $ 550,000.00  This includes 12 months at $31,250 and $40,000 total of quarterly bonuses |
| Final Bonus due | $ 258,897.56 |

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
FOR THE WESTERN DIVISION

| | | |
|---|---|---|
| MOON FENTON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No:   2:21-cv-02790 |
| | ) | Judge: Lipman/Pham |
| THE WEST CLINIC, PLLC, f/k/a THE | ) | |
| WEST CLINIC, PC, d/b/a WEST CANCER CENTER,) | | |
| WEST LEASECO, LLC, | ) | |
| WEST DESOTO PARTNERS, LLC, | ) | **JURY DEMAND** |
| WEST PARTNERS, LLC, | ) | |
| WEST UNION PARTNERS, LLC, | ) | |
| WEST WOLF RIVER PARTNERS, L.P., f/k/a | ) | |
| WEST WOLF RIVER PARTNERS, LLC, | ) | |
| WEST CAPITAL, LLC, | ) | |
| WEST CLINIC HOLDCO, PC, and | ) | |
| WEST EQUITY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

---

COMES NOW, the Plaintiff, Moon Fenton, M.D., by and through counsel, pursuant to

**Rule 33** of the **Federal Rules of Civil Procedure**, and hereby answers the Defendants' First Set

of Interrogatories, as follows:

**INTERROGATORY NO. 1:**    Identify all persons having knowledge or information of

any relevant or discoverable facts or information which support, negate, or otherwise relate to the

allegations or any matter related to this Litigation, regardless of whether you intend to call them

as a witness, and for each person identified provide a detailed summary of the facts or information

of which the person is knowledgeable.

**ANSWER:**    The Plaintiff objects to this Interrogatory because it is overly broad and

burdensome, and as to many of the people listed below, that unless otherwise stated, Plaintiff has

only general knowledge of the areas the witnesses should have information and knowledge of, but she cannot get into their minds to provide a definitive "summary of the facts or information of which the persons is knowledgeable".  However, without waiving the objection, and in a good faith attempt to answer, Plaintiff states:

1.     **Moon Fenton, M.D.** has knowledge of the allegations in the Complaint, Exhibits thereto, and of her answers to these Interrogatories and Document Requests, and of the documents provided to Defendant in discovery, and of the information set forth in her Rule 26 disclosures to which reference is hereby made.  For further answer, see Plaintiff's Answers to Interrogatories set forth below, and her response to the Document Requests and the documents and things provided therewith.  For further answer, see documents provided in response to the Document Requests.

2.     **Reid Evensky** should have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, of the representations made to Plaintiff, the legal

structure of Defendants, the deal with Methodist and why it was terminated, the False Claims Act case filed against The West Clinic, Methodist, Erich Mounce, Lee Schwartzberg, and others, the settlement thereof, and why it was dismissed without prejudice, the CARES Act loan, and of legal claims made by shareholders and the settlement or disposition of such claims.  He should also have knowledge of his communications with Plaintiff following her notice of termination and of the reasons why Defendants failed to honor their agreements with Plaintiff, and he would have knowledge of the two settlement agreements he provided to Plaintiff following her termination. For further answer, see Plaintiff's Response to Interrogatory No. 2, and see documents provided in response to the Document Requests.

3.     **Erich Mounce**, as CEO, made promises and representations to Plaintiff regarding bonuses, the shareholder model, and the buy-in for $500,000. He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective and secretive nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, the deal with Methodist and why it was

terminated, the False Claims Act case filed against The West Clinic, Methodist, Erich Mounce, Lee Schwartzberg, and others, the settlement thereof, and why it was dismissed without prejudice, and debts of The West Clinic and related entities, and of the representations made to Plaintiff. For further answer, see Plaintiff's Answers to Interrogatories Nos. 2 and 6, and see Exh. 9 to Complaint. For further answer, see documents provided in response to the Document Requests.

4.      **Mitch Graves**, CEO, should have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, the deal with Methodist and why it was terminated, the False Claims Act case filed against The West Clinic, Methodist, Erich Mounce, Lee Schwartzberg, and others, the settlement thereof, and why it was dismissed without prejudice, of the representations and promises made to Plaintiff, and the CARES Act loan. For further answer, see Plaintiff's Answers to Interrogatories Nos. 2 and 6, and see documents provided in response to the Document Requests.

5.      **Dr. Sonia Benn** was present at many of the shareholder meetings, and would have knowledge of what was discussed at the meetings.  She would have knowledge of her buy-in and of her bonuses.  She and Plaintiff had discussions regarding the buy-in where she didn't mind it because when she was hired, her student loans were paid back by the company.  When Plaintiff told her that she would be taking legal actions after she left The West Clinic, Dr. Benn shared that she had hoped The West Clinic would be fair.  She should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2, and see documents provided in response to the Document Requests.

6.      **Dr. Sylvia Richey**, now Medical Director, was present at most of the shareholder meetings and should have knowledge of what was discussed at said meetings. She would have knowledge of her buy-in, and the bonuses she was paid.  She should have knowledge of Plaintiff's allegations

contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2, and see documents provided in response to the Document Requests.

7.      **Dr. Stephen Besh**, was present at many of the shareholder meetings and should have knowledge of what was discussed at said meetings. He would have knowledge of his buy-in and bonus payments. He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of

6

any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2, and see documents provided in response to the Document Requests.

8.     **Dr. Kurt Tauer.**   He attended shareholder meetings and should have knowledge of what was discussed at said meetings.  On one occasion, he discussed whether new shareholders (Michael Berry and Richard Fine) would be allowed to buy-in.  He would have knowledge of his buy-in, if any, and of the bonuses he received.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to

shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2, and see documents provided in response to the Document Requests.

9.      **Dr. Lee Schwartzberg**, former medical director at the time, would have knowledge of his buy-in, if any, and of his bonuses.  He also discussed Plaintiff's shareholder buy-in with Plaintiff and was involved in the salary negotiations at the time of her hiring in 2012. He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, the deal with Methodist and why it was terminated, the False Claims Act case filed against The West Clinic, Methodist, Erich Mounce, Lee Schwartzberg, and others, the settlement thereof, and why it was dismissed without prejudice, and of the representations made to Plaintiff.  For

8

further answer, see Plaintiff's Answers to Interrogatories Nos. 2 and 6, and see documents provided in response to the Document Requests.

10.     **Dr. Bradley Somer**, now president, would have knowledge of his own buy-in, if any, and also of his bonuses.  He also discussed the unfortunate situation regarding the financial status of the West Clinic for the "young" shareholders (Eric Weidower, Greg Vidal, and Plaintiff), that despite buying-in, that they were unable to enjoy the compensation of the other shareholders in the past because of the mistake in joining One Oncology. He should have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, the deal with Methodist and why it was terminated, the False Claims Act case filed against The West Clinic, Methodist, Erich Mounce, Lee Schwartzberg, and others, the settlement thereof, and why it was dismissed without prejudice, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

11.   **Dr. Daniel Powell** should have knowledge of his own buy-in and of bonuses he received. He also would know what was discussed at shareholder meetings.  He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

12.   **Dr. Todd Tillmanns**, was present at many of the shareholder meetings and would know what was discussed at said meetings.  He would have knowledge of his own buy-in and of bonuses he received.  At one meeting, Dr. Tillmanns proposed to bring in more shareholders to use their buy-in to help with financial needs in 2018 when separating from Methodist.  Dr. Courtney Shires told Plaintiff that Dr. Tillmanns approached her in regards to becoming a shareholder with significant financial benefits as she becomes more of a senior shareholder.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies

10

and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

13.     **Bonnie V. Legg** would have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in

11

the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff. For further answer, see Plaintiff's Asnwer to Interrogatory No. 2.

14.   **Dr. Gary Tian**, was present at many of the shareholder meetings and would have knowledge of what was discussed at said meetings. He also would have knowledge of his buy-in and of the bonuses he received. He also shared with Plaintiff in about June of 2020, that since West received $10 million in the CARES Act loan, that money would surely benefit all of the shareholders, and that Plaintiff deserved a share of that money when it was forgiven. He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy-in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

15.   **Dr. Jarvis Reed**, was present at many of the shareholder meetings and would have knowledge of what was discussed at said meetings. He would have knowledge of his buy-in and of the bonuses he received. He also shared with Plaintiff that the shareholders typically make $1.2 – 1.4 million dollars per year. As Plaintiff understands, he is the only one who did not sign the new contract in 2019, stating he needed his personal legal counsel to review the documents, at which point a special shareholder meeting was held to discuss his termination. He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the

bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

16.   **Dr. Gregory Vidal**, was present at many of the shareholder meetings and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He expressed his concerns to Plaintiff regarding the honesty of the bonus structure.  He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

17.   **Dr. Eric Wiedower**, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He became a shareholder after Plaintiff had become a shareholder. He and Plaintiff discussed that he took some time to think about whether he would become a shareholder, and he did not accept the proposal immediately.  Ultimately, he accepted the position as a shareholder and was also told about the terms of his buy-in at the time of agreement.  Dr. Wiedower also voiced concerns over the fact that he paid his buy-in and the unfair compensation he received compared to the other shareholders.  He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive

nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

18.     **Dr. Jason Chandler**, was present at many of the shareholder meetings, and he would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He and Plaintiff spoke on several occasions regarding the unfair sharing of clinic resources and compensation. He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

19.     **Dr. Arnel Pallera**, was also an executive council member, who was present at many of the shareholder meetings, and he would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He should also have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

20.     **Dr. David Portnoy**, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and

of the bonuses he received, and he should have knowledge of the allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

21.    **Dr. Joseph Santoso**, a previous shareholder and an executive council member, was present at many of the shareholder meetings, and he would have knowledge of what was discussed at said meetings. He would have knowledge of his buy-in, if any, and of the bonuses he received, and he would probably have knowledge of how the bonuses were calculated and the different buy-in arrangements that Defendants had. Dr. Santoso provided Plaintiff with the shareholder agreement in or about February 2019 as she did not have a copy. The Plaintiff found out from Dr. Courtney Shires that when Dr. Santoso left West, he was compensated for his held bonuses and shares of the company nearing close to $1 million. He should also have knowledge of the other allegations contained in the Complaint, including Defendants' policies and procedures or lack thereof, Defendants' bonus structure, bonuses the shareholders were paid, the bonuses and compensation he was specifically paid, the details of his own buy in and/or vesting schedule, and the secretive nature of how bonuses were calculated and/or of how or why other shareholders were compensated, and complaints and/or concerns relating thereto. For further answer, see Plaintiff's Answer to Interrogatory No. 2, and see documents provided in response to the Document Requests.

22.    **Dr. Benton Wheeler**, a previous senior shareholder and an executive council member, was present at many or all of the shareholder meetings, and he would have knowledge of what was discussed at said meetings, and he would probably have knowledge of how the bonuses were calculated and the different buy-in arrangements that Defendants had. He would have knowledge

of his buy-in, if any, and of the bonuses he received.  He provided Plaintiff with a document in or about January 2020 showing the unfair wRVU distribution that Dr. Kurt Tauer and Dr. Brad Somer used to justify their productivity standing and thereby taking higher bonuses and clinic resources, suggestive of their deceit.  The Plaintiff may have a copy of this document, and will provide it if it is located.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2, and see documents provided in response to the Document Requests.

23.     **Dr. Michael Martin** was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He shared with Plaintiff on multiple occasions throughout the years that the bonus model was bogus and skewed to keep the people in line to agree with any and all

decisions being made by Dr. Lee Schwartzberg and Dr. Kurt Tauer.  He alluded to "What it means to be a West Clinic Doctor" as a threat to our bonuses, which is greater than the base salary.  As the bonuses came at the end of the year, no one knew what their bonus would be and since all the shareholders had equal voting rights, keeping the bonuses a secret was the only control over the shareholders.  For further answer, see documents provided in response to the Document Requests.

24.     **Dr. Manjari Pandey**, a previous employee, who was promised a shareholder status after two years of employment.  However, she was not given the opportunity to become a shareholder.  After she left, Plaintiff spoke with her on the phone and she told Plaintiff that she was lied to about becoming a shareholder despite her years of building a brain cancer program because she was a minority.

25.     **Dr. Richard Fine**, a recent shareholder who became a shareholder when The West Clinic required more people to put up personal guarantees to secure a loan from First Tennessee in late 2018/early 2019.  Plaintiff specifically asked whether the new shareholders would have to pay a buy-in as Plaintiff did, and Dr. Kurt Tauer stated that was something for discussion in the future, but he would unlikely contribute to any buy-in.  He would have knowledge of his buy-in, if any.

26.     **Dr. Courtney Shires**, an employed physician, who was approached by Todd Tillmanns regarding becoming a shareholder.  She declined because she didn't want to contribute to a buy-in of a company she felt was not financially stable.

27.     **Dr. Matthew Ballo**, a shareholder, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount

17

of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

28.    **Dr. Scott Baum**, a shareholder and an executive council member, was present at majority of the shareholder meetings, and would have knowledge of what was discussed at said meetings. He would have knowledge of his buy-in and of the bonuses he received.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details

18

of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff. For further answer, see Plaintiff's Answer to Interrogatory No. 2.

29.   **Dr. Michael Berry**, a recent shareholder, who became a shareholder when West required more people to put up personal guarantees to secure a loan from First Tennessee in late 2018/early 2019. Plaintiff specifically asked whether the new shareholders would have to pay a buy-in as she did, and Dr. Kurt Tauer stated that was something for discussion in the future, but he would unlikely contribute to any buy-in. He would have knowledge of his buy-in, if any.

30.   **Dr. David Portnoy**, a shareholder, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings. He would have knowledge of his buy-in and of the bonuses he received. Dr. Portnoy and Plaintiff spoke about how well he was being compensated because "he doesn't complain and just does what he's told." He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including

19

the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

31.    **Dr. Daniel Powell**, a shareholder, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

32.    **Mark Reed**, a shareholder, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in

and of the bonuses he received.  He should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

33.    **Linda Smiley**, a shareholder, was present at many of the shareholder meetings, and would have knowledge of what was discussed at said meetings.  He would have knowledge of his buy-in and of the bonuses he received.   She should also have knowledge of Plaintiff's allegations contained in the Complaint, including Defendants' policies and procedures and/or lack thereof, the various agreements signed by the shareholders, The West Clinic's bonus structure as it may have existed and as it may have changed and whether it was uniformly applied, details on the amount of bonuses the various shareholders were paid, details on how the bonuses were calculated for the various shareholders and what was deducted therefrom, the secrecy surrounding the calculation of bonuses for the various shareholders, the subjective nature of the bonus calculation process, the

details of any compensation or other monies received by the shareholders from The West Clinic and/or from the related entities, details on the pay scale for the various shareholders, information on what the various shareholders paid, if anything, in order to acquire their interests in The West Clinic and in the related entities, including the details of any vesting schedule and/or the details of any buy-ins for the various shareholders of The West Clinic, the details of payments made to shareholders who left The West Clinic and how same were calculated, the details of the financial dealings, expenses, and debts of The West Clinic and related entities, and of the representations made to Plaintiff.  For further answer, see Plaintiff's Answer to Interrogatory No. 2.

**INTERROGATORY NO. 2:**    Identify all persons from whom you have obtained statements in any form regarding the events or claims alleged in this Litigation by any person, whether the statement was obtained by interrogatory, interview, deposition, or otherwise. For each such statement, identify the date on which the statement was given, state the subject matter of the statement, identify any persons present when the statement was made, and identify the person(s) to whom the statement was made.

**ANSWER:** Plaintiff objects to this Interrogatory as overly broad, and burdensome. Further, the phrase "obtained statements in any form" is vague, especially since over her employment, and over the time she was a shareholder, she had innumerable conversations with various people that could constitute "statements", and she cannot possibly provide specific details about each.  However, without waiving the objection, and in a good faith attempt to answer, Plaintiff states:

1.    Erich Mounce discussed with Plaintiff in person, during her initial visit to The West Clinic during her employment interview in or about October 2011 that her initial employment was to be

for a 2-year duration followed by shareholder status at which point a buy-in would start with payments to be deducted from her bonuses.

2.      In a phone discussion with Lee Schwartzberg during salary negotiations, Plaintiff inquired about why the starting salary was significantly below the national average for graduates, and he explained that this would be made up by significant increases in salary and bonuses once Plaintiff became a shareholder. Dr. Schwartzberg explained that the buy-in amount deducted from Plaintiff's bonuses would not seem great because the bonuses are over the national average, and Plaintiff's wRVUs will continue to increase over time.   See also, Plaintiff's Answer to Interrogatory No. 6.

3.      In connection with Plaintiff's agreement to buy-in to The West Clinic, during the time frame of January 2015 to January 2020, on various occasions Mr. Mounce told Plaintiff that if she was to become a shareholder, she would become part owner of a valuable company, and she would receive compensation at the 95th percentile of the Hematology/Medical Oncology physicians in the U.S.  Mr. Mounce told Plaintiff that as a shareholder, she would receive salary/bonuses that would be calculated in the same manner as the other shareholders, she would have equal voting rights with the other physician shareholders, and she would receive six weeks paid vacation, continuing medical education, and retirement benefits. Mr. Mounce told Plaintiff that, as part of the buy-in as a shareholder in The West Clinic, she would be an equal owner with the other shareholders in The West Clinic, and she would be an equal owner with the other shareholders in The West Clinic and certain other related and affiliated entities.  Mr. Mounce told Plaintiff that if she became a shareholder, she would receive an annual salary of $510,000, and she would receive bonuses calculated the same as the other shareholders. Mr. Mounce told her that the cost of the buy-in to The West Clinic was $500,000. Mr. Mounce told her that in order to pay for the buy-in, money would be deducted from her bonuses on annual basis until a total of $500,000 had been

23

paid toward her buy-in. Mr. Mounce said that the amount deducted would be based on declining percentages until a total of $500,000 had been deducted from her bonuses; year one: 80%, year two: 60%, year 3: 40%, and year 4: 20%. Mr. Mounce also told Plaintiff that if she were to leave employment with The West Clinic, the amount she paid pursuant to the buy-would be refunded to her. Before she agreed to become a shareholder in The West Clinic, she requested a copy of the Shareholders Agreement, but Mr. Mounce told her that the contracts are a work in progress, and he never provided a written contract.

4.      In approximately February of 2017, Mr. Mounce provided Plaintiff with a verbal explanation of how her 2016 bonus had been calculated, and she made a contemporaneous note of this. She provided a copy of the contemporaneous note to Mitch Graves on July 21, 2020. See Exhibit 9 to Complaint.

5.      The West Clinic's Annual Report filed on March 31, 2019, listed Plaintiff as a Vice President and as a member of the Board of Directors. See Exhibit 1 to Complaint.

6.      In or around February 20, 2019, The West Clinic's new CEO, Mitch Graves requested for Plaintiff to sign a document that purported to terminate her "Employment Agreement" even though she did not sign and had not been asked to sign an "Employment Agreement". Plaintiff complied with Mr. Mounce's request, see Exhibit 2 to Complaint, because she didn't think she had a choice.

7.      In or about February 22, 2019, Plaintiff was requested by Lee Schwartzberg and Kurt Tauer to sign an employment agreement with The West Clinic, and she complied with this request. See Exhibit 3 to the Complaint.

8.      On or about November 30, 2019, Plaintiff and the other shareholders of The West Clinic were requested by Kurt Tauer and Reid Evensky to sign Termination of Shareholders Agreements that referenced a January 1, 2015 Shareholders Agreement.  Plaintiff complied with this request

even though she had not previously signed the January 1, 2015, Shareholders Agreement. See Termination of Shareholders Agreement attached to the Complaint as Exhibit 4.

9.      After the agreement between The West Clinic and Methodist was terminated in or about January 2019, Plaintiff learned from Reid Evensky the shareholders had to buy back the assets from Methodist, and toward that end, she learned her bonus money would be used to buy back assets from Methodist.

10.     In or around February 2019 in conversations with Dr. Sonia Benn and Dr. Gary Tian, Plaintiff was told that their bonuses were much higher than her bonuses and that, in fact, their bonuses had ranged between $700,000 and $800,000.

11.     In about April of 2020, Plaintiff was told by Mitch Graves during a shareholder meeting that The West Clinic applied for a Paycheck Protection Program CARES Act loan in the amount of $10 million, and she was told by Mitch Graves and Reid Evensky that The West Clinic intended to seek forgiveness of the $10 million loan pursuant to the terms of The CARES Act.

12.     The Plaintiff gave notice to Mitch Graves and Brad Somer of her termination of employment on April 24, 2020, in a letter, a copy of which is attached hereto, Bates Stamped FENTON000001.

13.     In connection with the termination of the agreement with One Oncology, Plaintiff attended a shareholders meeting when the shareholders were told by Mitch Graves and Kurt Tauer that they needed to sign an Unanimous Written Consent Agreement, dated July 10, 2020, a copy of which is attached to the Complaint as Exhibit 6.

14.     The Unanimous Written Consent agreement referenced a Side Letter affecting The West Clinic's application for and receipt of loan proceeds available under The CARES Act, and Plaintiff and several other physicians, including Michael Martin, Sylvia Richey, and Gary Tian raised concerns that The CARES Act Loan proceeds were not being used for proper purposes but were

being used to buy back the assets from One Oncology, because it was their understanding that One Oncology was being paid approximately $10 million. The Plaintiff told Michael Martin she was not going to sign the Unanimous Consent Agreement.

15.     Prior to the termination of her employment, Mitch Graves, Brad Somer, Sylvia Richey, Michael Martin, and Sonia Benn attempted to talk Plaintiff out of terminating her employment, and she was told by Reid Evensky she should wait at least six months before she left, because by that date, the value of her interest in the Defendants would be worth significantly more as a result of the forgiveness of the $10 million CARES Act loan.

16.     After Plaintiff gave 90 days' notice of her termination, she asked Mr. Graves about the bonus money she was owed and also about the buy out for her ownership and he told Plaintiff there was no buyout. See Exhibit 10 to the Complaint.

17.     After Plaintiff gave 90 days' notice of her termination, she engaged in some discussions with Reid Evensky, Brad Somer, and Mitch Graves.  Mr. Graves informed Plaintiff there was no buyout in the agreement. See Exhibit 10 to the Complaint.  Reid Evensky told Plaintiff The West Clinic had no money to pay a buy out because it had just had to buy its way out of One Oncology. Evensky told Plaintiff once the company has secured forgiveness of The Cares Act loan, the company would then go back to owning all assets and would be a profitable company, and that would take about 6 months after Plaintiff's resignation.  Evensky told Plaintiff her timing was "very unfortunate"  but he told Plaintiff he felt that Plaintiff deserved "something", and that he would bring it up to the Executive committee as these things are not "appropriate" for shareholder meeting discussions.

18.     Mr. Evensky provided Plaintiff with two different Termination, Purchase And Release Agreement(s). See Bates Stamp FENTON000074 – FENTON000093.

19.     In July 25, 2020, in an email exchange with Mitch Graves, Plaintiff asked him why some of the other shareholders had received much higher bonuses than her, and he did not answer her question. See Exhibit 10 to the Complaint.

20.     After Plaintiff's notice of termination, she and/or her counsel exchanged some emails/correspondence with Reid Evensky.   See Bates Stamped FENTON000009 – FENTON000011, FENTON000019, FENTON000220 – FENTON000243.

21.     Dr. Benton Wheeler and Plaintiff had a phone conversation after his departure in or about May 2020, and he informed Plaintiff that The West Clinic shareholders received substantial monies when The West Clinic sold assets to Methodist.

22.     Dr. Sonia Benn and Plaintiff had a discussion after Plaintiff left her employment, that she believed the Plaintiff was owed the buy-in monies and that she wished West leadership would be fair with Plaintiff.

23.     Dr. Eric Wiedower and Plaintiff had discussions in or about October 2018, November 2019, and February 2020 that he, too, was in the same situation with his buy-in, and he has not been getting his full bonuses per his RVUs.

24.     In shareholder meetings, there were discussions about whether new stakeholders, Dr. Richard Fine, Dr. Michael Berry, and Dr. Matt Ballo would also have a buy-in or not and these three were invited to become shareholders because their personal guarantees would boost The West Clinic's borrowing power from the banks.

25.     Dr. Brad Somer discussed in shareholder meetings how he felt bad about the three young shareholders (Plaintiff, Dr. Eric Wiedower, and Dr. Greg Vidal) who contributed to buy-in, but the business was no longer successful to maintain the bonuses shared previously.

26.     Dr. Todd Tillmanns discussed at a shareholder meeting that bringing in additional shareholders for their contributions to buy-in would be helpful when the organization needed

money when considering separating from One Oncology.  According to Dr. Courtney Shires, she was approached by Dr. Todd Tillmanns to become a shareholder, but she declined knowing she would have to pay in to a company that was financially unstable at the time.

27.     Dr. Kurt Tauer made numerous comments during multiple shareholder meetings stating that the shareholders make more money because they paid into it and have "skin in the game."  He and Plaintiff also discussed a need for a contract to discuss how to distribute company shares at the time of resignation or retirement as the shareholders are all supposed to be equal owners of the company.  However, Dr. Kurt Tauer and Brad Somer argued that some of the shareholders have been at the company longer than others and that should account for more contribution and more pay-out.

28.     Dr. Michael Martin and Plaintiff had multiple conversations regarding the calculations of bonuses being subjective to Dr. Kurt Tauer, Dr. Lee Schwartzberg, and Erich Mounce.  He related he had similar experiences as Plaintiff with Erich Mounce, when he asked Mounce to explain the bonus structure or calculation; he would bully his answers and frankly intimidate or yell at him. He also felt strongly that if the shareholders kept pressing for details and explanations, the ones doing it would be considered "bad citizens" of the clinic and their bonuses would be further unfairly calculated.  Dr. Martin also felt that this is a method to keep everyone in line, to ensure that no one really knew how the bonuses are calculated or distributed.

29.     Dr. Benton Wheeler left an envelope on Plaintiff's desk which stated "for your eyes only" and the contents thereof accused Dr. Kurt Tauer of improperly charging wRVUs under his name for other APP and physician work to inflate his bonuses.  The Plaintiff will try to locate the document and will provide it when located.

30.     For further Answer, see emails, text messages, and documents provided herewith. See also emails provided by Defendants, Bates Stamped West 182-195 and 229-232.

**INTERROGATORY NO. 3:**   Please describe in detail any conversations or communications that Plaintiff had with Defendants which support, negate, or relate to the allegations or matters relevant to this Litigation. As to each conversation or communication identified, provide a detailed summary of the substance of each communication or conversation, identify all persons who were present when the conversation or communication took place, and identify all documents or communications evidencing or relating thereto.

**ANSWER:** Objection. This question is overly broad and burdensome. However, without waiving the objection, and in a good faith attempt to answer, see Plaintiff's Answers to Interrogatories Nos. 1, 2, 5, 6, 8, and 13.  See also, Exhibits to Complaint, documents provided herewith, and see documents provided by Defendants or requested to be provided by Defendants in discovery.

**INTERROGATORY NO. 4:**   Please describe in detail any communications or conversations Plaintiff had with any other person other than the Defendants which support, negate, or relate to the allegations or matters relevant to this Litigation. As to each conversation or communication identified, provide a detailed summary of the substance of each communication or conversation, identify all persons who were present when the conversation or communication took place, and identify all documents or communications evidencing or relating thereto.

**ANSWER:** Objection. This question is overly broad and burdensome. However, without waiving the objection, and in a good faith attempt to answer, see Plaintiff's Answers to Interrogatories Nos. 2, 3, 5, 6, 7, 8, 13, and 14.  See also, documents provided in Plaintiff's Responses to Defendants' Document Requests.

**INTERROGATORY NO. 5:**   Identify all documents that support, negate, or otherwise relate to your contention that you had a contract under which you "bought in" to the West Clinic

at a maximum amount of $500,000 and that such "buy-in" would be refunded to you upon your termination of employment, as alleged in paragraphs 25 through 27 and 47 of the Complaint.

**ANSWER:**   This was a verbal contract.  Numerous documents establish that there was a contract to buy-in to The West Clinic and related entities.  For further answer, see Exhibits to Complaint, documents provided herewith, and see documents provided by Defendants or requested to be provided by Defendants in discovery, including Bates Stamped West 182-195 and 229-232.

**INTERROGATORY NO. 6:**   Please describe in detail all facts or information on which you base your allegation that Defendants promised or represented to you that you would have a "buy-in" to the West Clinic of a maximum amount of $500,000 and that such "buy-in" would be refunded to you upon your termination of employment, as alleged in paragraphs 25 through 27 and 47 of the Complaint.

**ANSWER:**   Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, see promises and representations made by CEO as set forth in Plaintiff's Answer to Interrogatory No. 2, and see Plaintiff's Answers to Interrogatories Nos. 3, 5, and 6.

After her initial visit to The West Clinic in or around October of 2011, Plaintiff spoke with Lee Schwartzberg to negotiate a starting salary.  He asked what Erich Mounce told her – that he was curious, and Plaintiff told him what he told her.  Dr. Schwartzberg corroborated the statements made by Mounce and later sent Plaintiff an email.  See Bates Stamped FENTON000008.

**INTERROGATORY NO. 7:**   Please describe in detail the factual and legal basis for your contention that you entered into an oral, binding contract to "buy-in" to the West Clinic, as set forth in paragraphs 47 through 50 of the Complaint.

**ANSWER:**   Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, see Plaintiff's Answers to Interrogatories Nos. 2, 3, 5, 6, 8, 13 and 14.  Plaintiff relied to her detriment on the promises and representations of CEO Mounce, and she fully performed her side of the contract up to the date of her termination.

**INTERROGATORY NO. 8:**   Please describe in detail all facts or information on which you base your contention that Defendants improperly calculated your bonuses.

**ANSWER:**   Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, Plaintiff states she knew that her work RVUs were at least average to other shareholders, and many years above average or one of the top wRVUs. Despite that, Plaintiff was not given equal productivity bonuses compared to other shareholders, even with her participation in quality measure, development of head and neck cancer program (which became the 5th leading cancer diagnosis seen at West Clinic), active research role as a principal investigator, and teaching trainees and participating services at Methodist hospital.  Further, the bonus calculation was very secretive, and Plaintiff does not know how Defendants came up with the numbers on the bonuses.

In 2017, the Plaintiff asked Erich Mounce to explain to her the 2016 bonus calculation.  He outlined the following:   $150,268 (education), $301,265 (Quality Metrics), $805,710 (productivity) added up to $1,257,243.  Plaintiff was paid base salary of $510,000 leaving $747,243 for her bonus.  However, she was only given a $298,897 bonus that year.  When asked, he said it would go to Plaintiff's buy-in, so that year alone, Plaintiff contributed $448,346 to her buy-in when no more than $500,000 was to be deducted.  (See Exhs. 9 and 10 to Complaint).  For

further answer, see Plaintiff's Answers to Interrogatories Nos. 2, 13, and 14, and documents referred to therein.

**INTERROGATORY NO. 9:**      Please describe in detail all facts or information on which you base your contention that there were deductions from your bonuses that were applied to your "buy-in" to the West Clinic.

**ANSWER:**   Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, see Plaintiff's Answers to Interrogatories Nos. 2, 5, 6, 7, 8, 10, and 13.  See also, Exh. 9 to Complaint and see emails Bates Stamped West 182-195 and 229-232.  See also, Defendants' Response to Plaintiff's Requests for Admissions.

**INTERROGATORY NO. 10:**   Please describe in detail all facts or information on which you base your contention that that you are owed money for your ownership interests in Defendants upon your voluntary termination of employment.

**ANSWER:**  Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, Plaintiff states that upon her termination, based on Plaintiff's buy in, she was to receive the $500,000 that was supposed to have been deducted from her bonuses for the buy-in, but it turns out much more than $500,000 was deducted from her bonuses.  Additionally, she signed certain documents that provided she would be paid for her ownership interests.  For further answer, see Plaintiff's Answers to Interrogatories Nos. 2, 3, 5, 6, 7, 8, 13, and 14.

**INTERROGATORY NO. 11:**  Please describe in detail each and every material misrepresentation of fact that you allege was made by any of the Defendants related to the matters

in this Litigation. For each alleged misrepresentation, provide a description of the substance of the alleged misrepresentation; state the date it was made; identify the person who made it; state the manner in which it was made, *i.e.*, the type of communication; state the place at which it was made; identify all documents or communications evidencing or relating to the misrepresentation; and identify any other persons who were present or witnessed the alleged misrepresentation.

**ANSWER:**   Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, see Plaintiff's Answers to Interrogatories Nos. 2 and 6, with respect to her conversations with CEO Mounce and Dr. Schwartzberg.  The Plaintiff is not aware of any witnesses to these conversations.  For further answer, see Plaintiff's Answers to Interrogatories Nos. 2, 3, 5, 6, 8, 13, and 14.

**INTERROGATORY NO. 12:**   Please describe in detail how you discovered information about the West Clinic's assets, as alleged in paragraphs 63 through 65 of the Complaint. Your response should include, but not be limited to, the exact date(s) you made such discoveries, who provided the information to you, any other persons who were present, and the details of the information you allege you discovered.

**ANSWER:**   Objection.  This Interrogatory is overly broad and burdensome.  However, without waiving the objection and in a good faith attempt to answer, Plaintiff heard this mentioned during a shareholder meeting in or around November or December 2018, but she learned more after she was requested to sign, and did sign, a personal guarantee.  Plaintiff later spoke with other people, such as Dr. Joseph Santoso, Dr. Gary Tian, and Dr. Benton Wheeler, who informed her that when the transaction occurred, they had received monies as a result of the asset sale to Methodist.

**INTERROGATORY NO. 13:**  Please describe in detail the amounts you allege were deducted from your bonuses towards a "buy-in" and identify all documents you used, created, or maintained to keep records of such deductions.

**ANSWER:**   Objection.   This information is in the possession of Defendants, and Plaintiff has not been provided documents necessary to calculate the amounts deducted, and she reserves the right to modify these calculations once additional documents are obtained, but in a good faith attempt to answer, Plaintiff states using documents provided by Defendants to date, it appears the following was retained by Defendants from Plaintiff's bonuses, to-wit:

Buy-In Calculation Using documents provided by Defendants[1]

| | Total Bonus | Total Bonus to be Paid to Fenton | Total Bonus Retained |
|---|---|---|---|
| 2015: | $489,563.63 | $77,912.72 (Paid: $30,632.17)[2] | $458,931.46 |
| 2016: | $747,243.91 | $298,897.56 | $448,346.35 |
| 2017: | $654,739.08 | $392,843.44 | $261,895.64 |
| 2018: | ???????????[3] | $40,000.00 | $400,000.00??[4] |
| 2019: | ?????????? | $401,994.11 | ?????????____ |
| | | Total Bonus Retained: | $1,569,173.45 |

[1] West 229, 230, 231, and 232.
[2] Based on discrepancy in 2015 of $47,280.55.  $489,563.63 - $77,912.72=$411,650.91 + $47,280.55 = $458,931.46. (West 229; 232).
[3] It appears Defendant failed to provide bonus information for 2018 and 2019.
[4] Deducted for building purchase.  Plaintiff does not have documents showing the amount deducted on wRVU (which may be higher), but this was her calculation based on her estimate of what Plaintiff was told the money would be used for.  For further answer, see Plaintiff's Answer to Interrogatory No. 14.

**INTERROGATORY NO. 14**:  Please describe in detail the basis for your contention that Defendants appropriated approximately $400,000 from your 2018 bonus to buy back assets from Methodist, as alleged in paragraphs 67 and 150 of the Complaint.

**ANSWER**:   Plaintiff was not provided with details of exactly how much money was deducted from her bonus check for 2018.  However, Plaintiff believes her wRVU in 2018 was approximately 9,027, but this number should be in possession of Defendant, and has been requested by Plaintiff in discovery.  The Plaintiff does not know the exact calculation of the Methodist wRVU compensation at the time (she was not provided with documents regarding the partnership agreement with Methodist).  The Plaintiff heard values ranging from $130 to $135 per wRVU.  This would mean that The West Clinic would have been paid approximately $1,218,645 for Plaintiff's 2018 wRVUs.  However, West was ending the Methodist contract and was required to buy the Wolf River building. Plaintiff estimated that at least $400,000 or more from her bonuses were used in 2018 as she earned $550,000 that year.

**INTERROGATORY NO. 15**:  Please identify the date upon which you became aware that Defendants had deducted more than $500,000 from your bonuses, as alleged throughout the Complaint.

**ANSWER**:  Plaintiff did not learn this until June of 2022 when she received documents from the Defendants.  For further answer, see Plaintiff's Answer to Interrogatory No. 13.

**INTERROGATORY NO. 16**:  Please describe in detail the reason(s) you voluntarily terminated your employment with the West Clinic.

**ANSWER**:  The Plaintiff had become increasing disenchanted with The West Clinic's leadership, the secrecy and intimidation regarding the bonuses, and its culture.  She was offered a

35

co-lead in Head and Neck Cancer program at University of Pittsburgh Medical Center, which is an NCI-designated cancer center, nationally top-ranked, and she decided to accept the opportunity.

**INTERROGATORY NO. 17:** Please describe in detail your notice of voluntary termination from the West Clinic, including but not limited to the date on which you provided a notice, the manner in which you provided a notice, to whom you provided notice, and any other persons who were present or witnessed you providing notice of your voluntary termination.

**ANSWER:**   The Plaintiff gave notice on 4/24/20 in writing and provided the notice to Dr. Brad Somer and Mitch Graves.  See Bates Stamped FENTON000001.

**INTERROGATORY NO. 18:**   Please provide a detailed itemization of all damages and other amounts for which you seek recovery in this Litigation and identify all documents evidencing or relating to these claimed damages.

**ANSWER:**   Objection.  The Plaintiff has not received all the documents she requested that Defendants produce in discovery necessary to do a projection, and she reserves the right to revise this upon receipt of such documents.  Plaintiff is claiming economic and punitive damages including but not limited to: (1) The Amount deducted from her calculated bonuses in excess of $500,000; (2) The amount that should have been paid to Plaintiff upon termination of her employment: $500,000.00 plus bonuses that were retained over and above this amount; (3) The value of her ownership interest in the Defendants in an amount to be set by the jury; (4) The amount that should have been paid to her as a member, partner, and/or shareholder in the Defendants since her termination in an amount to be set by the jury; (5) If rescission is found to be the appropriate remedy, the return of all monies withheld from Plaintiff's bonuses; and (6) The amount of bonuses paid to other shareholders over and above what was paid to Plaintiff to the extent her bonuses were calculated differently.  The Plaintiff is also asking for an accounting, for a constructive trust and/or

36

resulting trust to be imposed on the assets of the Defendants, and for an appraiser to be appointed to determine the value of the various entities. Plaintiff is claiming attorney's fees, costs, and litigation expenses, and prejudgment interest, in such amounts as allowed by the judge.  For further answer, see Plaintiff's Answers to Interrogatories Nos. 13 and 14.

**INTERROGATORY NO. 19:**  To the extent not already identified, please identify all documents or tangible items upon which you rely in support of your allegations in the Litigation.

**ANSWER:**    Objection.   Discovery is ongoing and Plaintiff has not received all documents she requested from Defendants.  Plaintiff reserves the right to revise this answer, and also, will be making a pretrial exhibit filing to which reference is hereby made.  In a good faith attempt to answer, see Exhibits to Complaint, see documents provided herewith, see Defendants' Answers to Interrogatories and Document Requests and documents provided therewith (or requested by Plaintiff and not yet provided).  See also, Defendants' Response to Plaintiff's Requests for Admissions.

**INTERROGATORY NO. 20:**  If your response to any of the First Requests for Admission is anything other than an unqualified admission, please provide the following information for each response:

    a.  All facts that you contend support any responses constituting your denial, refusal to admit, or qualified admission;

    b.  Identify any documents that support any responses constituting your denial, refusal to admit, or qualified admission; and

c. Identify any persons who purportedly possess knowledge of facts or information supporting any responses constituting your denial, refusal to admit, or qualified admission.

**ANSWER:**   Please see Plaintiff's Responses to Requests for Admissions.

RESPECTFULLY SUBMITTED this the 24th day of June, 2022.

**THE BURKHALTER LAW FIRM, P.C.**

s/David A. Burkhalter, II
David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
Zachary J. Burkhalter, BPR #035956
Attorneys for Plaintiffs
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing document was served upon counsel of record via Email, this the 24th day of June, 2022.

s/David A. Burkhalter, II
David A. Burkhalter, II

38

# Exhibit D

**WEST CLINIC SHAREHOLDERS MEETING**

**August 22nd, 2018**

**Meeting Minutes**

I.    **CALL TO ORDER:**    The meeting was called to order by Dr. Kurt Tauer at 6:20 p.m.

   **Shareholders Present:**    Drs. Tauer, Tian, Richey, Benn, Fenton, Smiley, Schwartzberg (via phone), Vidal, Somer, Tillmanns, Chandler, Powell, Pallera, Wheeler, Portnoy, J. Reed and Besh.

   **Shareholders not present:**   Drs. Mark Reed, Mike Martin, Scott Baum

   **Management Present:**    Erich Mounce, Reid Evensky and Ron Davis

II. **REVIEW OF MINUTES:**

   The shareholders were presented with the minutes from the previous meeting held on June 26th, which they reviewed.  Upon review, the group had no corrections. Dr. Arnel Pallera put forth a motion for approval and the motion was subsequently seconded by Dr. Richey, the motion was then unanimously approved by the shareholders.

III. **REVIEW OF FINANCIALS:**

   A. **None Presented**

IV. **OLD BUSINESS:**

   A. **Updates / Minutes on Committees**

      a. **PSA Operating Committee: No Minutes Attached**

         No PSA meetings have been held since the last shareholders meeting

CONFIDENTIAL WEST007693

**b. Cancer Center Council: No Minutes Attached**

No Cancer Council meetings have been held since the last shareholders meeting

**c. HOTP Minutes : Education / Fellows: Minutes Attached**

Erich Mounce provided the shareholders with copies of the past several months of HOTP meeting minutes for their review.

**d. Clinical Practice Committee: Minutes Attached**

Erich Mounce provided the shareholders with copies of the past several months of CPQ subcommittee meeting minutes for their review.

**e. Executive Committee Report:  Minutes Attached**

Erich Mounce provided the shareholders with copies of the past several months of Executive Committee meeting minutes for their review.

**B.  Updates in Old Business:**

**a.  Methodist Unwind Update:**

Dr. Tauer and Erich Mounce provided the shareholders with an update on the unwind negotiations with MLH. Following the first two formal unwind meetings the following has been communicated to West; 1) MLH is not interested in a radiation oncology joint venture; 2) They are requesting to focus on strictly following the unwind agreement; 3) West will acquire the Germantown linear accelerators;  4)  West will acquire the Germantown Cancer Center building; 5) The MRPC breast center will leave the Germantown building; 6)West  will acquire back all of its radiology and infusion departments; 7) MLH is not interested in West leasing the cancer center space built out in the new downtown tower; 8) West will be reassigned the leases for Midtown, Desoto and Brighton sites, finally ; 9) Both sides are still unclear on the stem cell

CONFIDENTIAL WEST007694

transplant program, but both sides would like to try and keep the program growing with minimal disruption.

Initial CONs have been filed for the linear accelerators and the PET Scanners. We will be filing a CON for the ASTC in the very near future. The ASTC will require specific construction reconfiguration within our radiology department.

**b. University Proposal:**

Erich Mounce reviewed for the shareholders the proposal provided to UTHSC by West last week.  The proposal that was provided is attached as exhibit "A" to these minutes.   Alter discussion the shareholders agreed with the proposal. The executive committee will continue to work with UTHSC in order to try and complete a deal that is beneficial to both West and UTHSC for the continuation of research and education.

## V.  NEW BUISNESS

### A.  Tenet / St. Francis:

Erich provided the shareholders with an update on the discussions with St. Francis / Tenet on developing a breast center on both the Park and Bartlett campuses in a joint venture model.  Currently we are in informal discussion sand formal business structure or business terms have been proposed.  Dr. Berry is involved in the discussions.   The Executive Committee will continue to monitor these discussions.

## VI. GENERAL DISCUSSION

**None**

CONFIDENTIAL WEST007695

**VII.   ADJOURNMENT:**

THERE BEING NO FURTHER DISCUSSION THE MEETING WAS
ADJOURNED AT 8:20 PM.

These minutes are respectfully submitted for review and comment by:

_____
Erich Mounce

These minutes are accepted by:

_____
Kurt W. Tauer, M.D.
Secretary/Shareholder

CONFIDENTIAL WEST007696

# Exhibit E

# FENTON, M.D.

## vs

# WEST CLINIC, PLLC, et al.

---

## REID EVENSKY

## November 08, 2022

---



**Melissa M. Smith, RPR, LCR, CCR**

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TENNESSEE
2                   FOR THE WESTERN DIVISION
   _____
3
   MOON FENTON, M.D.,
4
                        Plaintiff,
5
   vs.                          No. 2:21-cv-02790
6                               Judge: Lipman/Pham
                                JURY DEMAND
7
   THE WEST CLINIC, PLLC, f/k/a THE
8  WEST CLINIC, PC, d/b/a
   WEST CANCER CENTER,
9  WEST LEASECO, LLC,
   WEST PARTNERS, LLC,
10 WEST UNION PARTNERS, LLC,
   WEST WOLF RIVER PARTNERS, L.P., f/k/a
11 WEST WOLF RIVER PARTNERS, LLC,
   WEST CAPITAL, LLC,
12 WEST CLINIC HOLDCO, PC, and
   WEST EQUITY, LLC,
13
                        Defendants.
14 _____

15

16          Video/Videoconference Deposition of:

17          REID EVENSKY

18          Taken on behalf of the Plaintiff
            November 8, 2022
19
            Commencing at 1:35 p.m.
20

21
   _____
22
            Elite-Brentwood Reporting Services
23           www.elitereportingservices.com
            MELISSA M. SMITH, RPR, LCR, CCR
24            Senior Managing Associate
              Chattanooga, Tennessee
25                  (423)266-2332

1

2                    **A  P  P  E  A  R  A  N  C  E  S**

3

4

5    **For the Plaintiff:**

6              MR. DAVID A. BURKHALTER, II
             Attorney at Law
7              The Burkhalter Law Firm, PC
             111 South Central Street
8              Knoxville, TN 37901
             (865) 524-4974
9              david@burkhalterlaw.com

10

11

12   **For the Defendants:**

13             MR. MICHAEL G. McLAREN
             MS. AMY WORRELL STERLING
14             Attorneys at Law
             Black McLaren Jones Ryland & Griffee, PC
15             530 Oak Court Drive
             Suite 260
16             Memphis, TN 38117
             (901) 730-4043
17             mmclaren@blackmclaw.com
             asterling@blackmclaw.com

18

19

20   **Also present:**

21             MS. AUGUSTA SMITH - Videographer
22             DR. MOON FENTON

23

24

25

1

2                         I   N   D   E   X

3                                               Page

4   Examination
    By Mr. Burkhalter                            6
5
    Examination
6   By Mr. McLaren                               47

7

8
                    E   X   H   I   B   I   T   S
9
                                                Page
10
    Exhibit No. 1                                8
11       Schedule A to Rule 30(b)(6) Notice
         (Docs. 16-18)
12
    Exhibit No. 2                                25
13       2015 Shareholders Agreement
         (Docs. 551-589)
14       Bates No. Confidential West000255 –
         293
15
    Exhibit No. 3                                33
16       Shareholder Employment Agreement
         (Docs. 827-840)
17       Bates No. Confidential West012458 –
         12471
18
    Exhibit No. 4                                38
19       Termination of Employment Agreement
         signed by Fenton (Doc. 330)
20       Bates No. Confidential West000816

21   Exhibit No. 5                               42
         Termination of Shareholder's Agreement
22       11-30-19 (Docs. 328-329)
         Bates No. Fenton000003 – 4
23

24

25

1

2
                    S T I P U L A T I O N S
3

4

5          The videoconference deposition of REID

6   EVENSKY was taken by counsel for the Plaintiff, by

7   Notice, with all participants appearing at their

8   respective locations, on November 8, 2022, for all

9   purposes under the Federal Rules of Civil

10  Procedure.

11         All objections, except as to the form of

12  the question, are reserved to the hearing, and said

13  deposition may be read and used in evidence in said

14  cause of action in any trial thereon or any

15  proceeding herein.

16         It is agreed that MELISSA M. SMITH, RPR,

17  Notary Public and Licensed Court Reporter for the

18  State of Tennessee, may swear the witness remotely,

19  and that the reading and signing of the completed

20  deposition by the witness is not waived.

21

22

23

24

25

1   Q.      And she was not paid anything for her

2   membership in West Capital?

3   A.      That's correct.

4   Q.      And, of course, the West Clinic, PLLC,

5   Dr. Fenton was a member of that PLLC, correct?

6   A.      That's correct.

7   Q.      Is she still -- she still a member?

8   A.      I do not think she is a member.

9   Q.      And why is that?

10  A.      At her termination and resignation,

11  I think the operating agreement dictates what

12  happens to her ownership interest.

13  Q.      And are you familiar with that operating

14  agreement?

15  A.      I am.

16  Q.      And does that require the West Clinic,

17  PLLC, to do anything in connection with her

18  ownership interest?

19  A.      I need some help understanding that

20  question.

21  Q.      Fair taken.  Fair point.

22          The operating agreement with respect to

23  Dr. Fenton's membership in that organization upon

24  resignation, does that operating agreement

25  specify what the West Clinic is supposed to do

1  with respect to determining a value?

2  A.     With respect to determining a value, it is

3  to engage regularly employed accountants to

4  determine whether or not any value exists.

5  Q.     And the conclusion was it was of zero

6  value.  Is that fair?

7  A.     That's correct.

8  Q.     But it's still in existence?

9  A.     It is still in existence.

10  Q.     And are you familiar with the financial

11  statement of West -- The West Clinic?

12  A.     I'll need some help in understanding.

13  When you say "financial statements," something

14  current?  Is there something in particular?

15  General -- help me understand the question,

16  please.

17  Q.     Okay.  I'll withdraw that question.

18  A.     And I'm not -- I'm not trying to be

19  argumentative, David.  I'm just trying to

20  understand what you're asking.

21  Q.     No I understand.  I understand.

22         West Clinic Holdco, PC, was Dr. Fenton a

23  shareholder in that?

24  A.     She was.

25  Q.     Is she still a shareholder?

1  A.      I do not think she is.

2  Q.      And what -- is that -- is that PC still in

3  existence?

4  A.      It is.

5  Q.      And does it have any value?

6  A.      It does not.

7  Q.      And what is its function?

8  A.      It holds equity interests that come

9  through the earlier LLCs and LPs that you were

10  describing.  All of these entities have tax

11  functions.  Those tax functions inure to the

12  benefits of each of these members you're asking

13  about.

14  Q.      And why it is that she is no longer a

15  shareholder in West Holdco?

16  A.      I think there is a shareholder agreement

17  that dictates what happens to her equity upon her

18  termination or resignation.

19  Q.      Have we talked about West Equity, LLC?

20  I don't think so.

21          What is West Equity, LLC?

22  A.      West Equity was an entity that -- well,

23  you asked about West Equity, West Equity, LLC?

24  Q.      Yes, sir.

25  A.      Okay.  West Equity, LLC, was an entity