**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| MOON FENTON, M.D., | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE WEST CLINIC, PLLC, f/k/a THE | ) |
| WEST CLINIC, PC, d/b/a WEST CANCER | ) |
| CENTER; WEST DESOTO PARTNERS, | )    No. 2:21-cv-02790-SHL-tmp |
| LLC; WEST UNION PARTNERS, LLC; | ) |
| WEST WOLF RIVER PARTNERS, L.P., | ) |
| f/k/a WEST WOLF RIVER PARTNERS, | ) |
| LLC; WEST CAPITAL, LLC; and WEST | ) |
| CLINIC HOLDCO, PC, | ) |
|     Defendants. | ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Moon Fenton, M.D. ("Dr. Fenton") brings this diversity action for breach of

contract and conversion[1] against Defendant The West Clinic, PLLC, f/k/a The West Clinic, PC,

d/b/a West Cancer Center ("The West Clinic") and related entities (collectively, "Defendants").

The lawsuit arises out of Dr. Fenton's employment at The West Clinic from 2012 to 2020.

---

[1] Plaintiff's Complaint includes causes of action for breach of contract, conversion, negligent misrepresentation, intentional misrepresentation, promissory fraud, fraudulent concealment, fraud by omission, and constructive trust/resulting trust. (ECF No. 1 at PageID 24-28.) Before trial, Dr. Fenton stipulated to the dismissal of her claims for negligent misrepresentation, promissory fraud, fraudulent concealment, and fraud by omission, (ECF No. 79), which were dismissed pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), (ECF No. 81). After trial, in her Conclusions of Law, Dr. Fenton conceded her intentional misrepresentation claim, as well as her conversion claim as it relates to her allegation that Defendants misappropriated her property by making bonus deductions in excess of $500,000. (ECF No. 95-1 at PageID 2265, n. 2.) In addition, constructive and resulting trusts are an equitable remedy, not independent causes of action. 76 Am. Jur. 2D Trusts § 169 (2023). As a result, the remaining claims here are breach of contract (alleging breaches of the oral buy-in agreement and written partnership agreements) and conversion as it relates to Defendants' alleged failure to repay the cost of the buy-in upon Dr. Fenton's resignation, with constructive trust/resulting trust sought as a remedy.

From May 22 to May 24, 2023, the Court held a bench trial on these claims.  (ECF Nos. 85-86, 90.)  At the close of Dr. Fenton's case, Defendants made an Oral Motion for Judgment on Partial Findings, which the Court took under advisement.  (ECF No. 86.)  On June 30, 2023, the Parties submitted their respective proposed findings of fact and conclusions of law.  (ECF Nos. 95-96.).  Having considered the evidence at trial, as well as the Parties' pre- and post-trial submissions, the Court finds that Dr. Fenton cannot recover for breach of contract or conversion. Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of facts and conclusions of law, which explain its reasoning.

**FINDINGS OF FACT**

I.   **Parties and Witnesses**

Dr. Fenton is a medical oncologist and hematologist.  (ECF No. 88 at 47:10-11.)  In February 2012, The West Clinic hired Dr. Fenton as an employed physician in the medical oncology group.  (ECF No. 84, Stipulations of Fact ("Stips.") ¶ 1-2.)  Dr. Fenton entered into a written employment contract with The West Clinic on February 6, 2012, and began her employment in July 2012.  (Stip. ¶ 2.)  Thereafter, she received a salary and was paid employee bonuses.  (Id.)

The West Clinic's shareholders voted to accept Dr. Fenton as a new shareholder in January 2015, and she began attending shareholder meetings in February 2015.  (Stips. ¶ 5-6.) As a shareholder, Dr. Fenton immediately became an equal owner with the other shareholders in The West Clinic, West DeSoto Partners, and West Union Partners and had equal voting rights in the same.  (Stip. ¶ 7.)  She also became eligible to receive shareholder bonuses.  (Stip. ¶ 9.)  On April 24, 2020, Dr. Fenton gave written notice that she was resigning effective July 31, 2020. (Stip. ¶ 16; Trial Exhibit ("Ex.") 2.)  At the time of her resignation, Dr. Fenton had a 5%

ownership interest in the following entities:  The West Clinic, PLLC, West Capital, LLC, West Desoto Partners, LLC, West Union Partners, LLC, and West Clinic HoldCo, PC.  (Stips. ¶ 17-18.)

The West Clinic is a Tennessee professional limited liability company that was converted from a Tennessee professional corporation on December 1, 2019.  (Stip. ¶ 15.; Ex. 13.)  As a professional corporation, the shareholders of The West Clinic, P.C. were subject to a Shareholder Agreement, effective January 1, 2015, until the agreement was terminated on November 30, 2019.  (Stip. ¶ 4; Ex. 26.)  Following that termination, The West Clinic and its shareholders became subject to an Operating Agreement, dated December 1, 2019.  (Ex. 13.)

West DeSoto Partners, LLC ("West DeSoto") is a Tennessee limited liability company. (Ex. 12.)  West Desoto and its members are subject to the Restated and Amended Operating Agreement of West DeSoto Partners, LLC, dated January 1, 2007.  (Id., Stip. ¶ 20.)

West Union Partners ("West Union") is a Tennessee limited liability company.  (Ex. 11.) West Union and its members are subject to the Restated and Amended Operating Agreement of West Union Partners, LLC, dated January 1, 2007.  (Id.; Stip. ¶ 21.)

West Capital, LLC ("West Capital") is a Tennessee limited liability company.  (Ex. 10.) West Capital and its members are subject to the Operating Agreement of West Capital, LLC, dated October 10, 2019.  (Id.; Stip. ¶ 22.)

West Clinic HoldCo, P.C. ("West HoldCo") is a Tennessee professional corporation. (Ex. 42.)  West HoldCo and its shareholders and its shareholders are subject to the West Clinic HoldCo, P.C. Shareholders' Agreement, dated November 21, 2019.  (Id.; Stip. ¶ 23.)

West Wolf River Partners, L.P., f/k/a West Wolf River Partners, LLC ("West Wolf River") is a Tennessee limited partnership that is comprised of a limited partner, West Capital,

owning 99.9%, and also a general partner, West GP, LLC, whose sole member is West HoldCo, owning the remaining .10%. (Stip. ¶ 25.) Dr. Fenton did not have a direct ownership stake in West Wolf River. (See stips. ¶ 18, 25; ECF No. 87 at 73:19-74:3.)

Mitchell Graves is the current Chief Executive Officer ("CEO") of The West Clinic, a position he has held since May 2019. (ECF No. 87 at 36:1-36:19.) Erich Mounce was the CEO of The West Clinic from 2010 to 2018. (Stip. ¶ 3.) Lee Schwartzberg, M.D. is a founding shareholder of The West Clinic. (ECF No. 89 at 7:15-17.) He worked at The West Clinic from 1987 to 2021 and was the Medical Director and President during the time at issue in this litigation. (Id. at 6:21-7:12.) Kurt Tauer, M.D. is a founding shareholder of The West Clinic and the current Chairman of its Board of Directors. (ECF No. 88 at PageID 6:18-7:10.) Bradley Somer, M.D. is the current President of The West Clinic. (ECF No. 89 at 43:10-13.) He has worked at The West Clinic since 2002 and became a shareholder in 2004. (Id. at 42:24-43:13.) Reid Evensky is the outside general counsel for The West Clinic. (ECF No. 88 at 235:19-24.)

## II.    The West Clinic's Shareholder Compensation Model

The issues in this matter turn on the details of the compensation model and contractual relationships between Dr. Fenton and The West Clinic. The Court finds the following facts regarding the compensation model.

In November 2011, Dr. Fenton interviewed for a medical oncologist position with The West Clinic. (Id. at 51:8-19.) During her interview, she met with Mr. Mounce, Drs. Schwartzberg and Tauer, and others. (Id. at 51:20-53:16) At a lunch meeting with Mr. Mounce, he explained the process of how a physician becomes a shareholder. (Id. at 54:2-4.) He explained that new hires typically begin working as non-shareholder physicians and that after two years of employment they became eligible for shareholder consideration. (Id. at 54:6-11.)

4

To become a shareholder, an existing shareholder would nominate a non-shareholder and the other shareholders would vote on the nomination.  (ECF No. 87 at 159:14-24.)  After the interview, Dr. Fenton corresponded with Dr. Schwartzberg via email and they spoke on the phone in December 2011. (ECF No. 88 at 55:11-56:13, 56:25-57:25; Ex. 44.)  Shortly thereafter, Dr. Fenton agreed to join The West Clinic.  (ECF No. 88 at 58:13-14.)  On February 6, 2012, Mr. Mounce forwarded an employment contract to Dr. Fenton, which she signed, and Dr. Fenton began her employment in July 2012.  (Id. at 58:15-16; Ex. 35)

In the summer of 2014, after working at West Clinic for two years, Dr. Fenton asked Mr. Mounce about the possibility of becoming a shareholder.  (ECF No. 88 at 61:21-62:6; Ex. 27.) Dr. Fenton then met with Mr. Mounce and Drs. Schwartzberg and Tauer, during which they informed her that the shareholders did not yet want to nominate her to become a shareholder. (ECF No. 88 at 62:19-24.)  After this meeting, Dr. Fenton sent a letter of resignation to Drs. Schwartzberg and Tauer.  (Id. at 63:19-64:24; Ex. 28.)  Dr. Schwartzberg then met with Dr. Fenton, offered her a higher salary, and convinced her to withdraw her resignation letter and remain at The West Clinic.  (ECF No. 88 at 65:1-17.)

On January 28, 2015, Dr. Fenton was voted in as a shareholder.  (Stip. ¶ 5; Ex. 29.)  As a new shareholder, she had equal ownership and voting rights with the other shareholders.  (Stip. ¶ 7.)  She was also entitled to receive quarterly shareholder bonuses based on a compensation model, which had three components:  relative value units ("RVUs"), quality metrics—also referred to as "What it Takes to be a West Clinic Physician" or "WITTBWCP" —, and education and citizenship.  (Stip. ¶ 9; ECF No. 87 at 177:21-24; ECF No. 89 at 21:22-23:17; Ex. 32.)  The RVUs and quality metrics were based on objective measures, but Drs. Schwartzberg and Tauer had discretion to determine a shareholder's portion of the education and citizenship component

and make final adjustments to the compensation model calculations.  (ECF No. 87 at 178:11-22; ECF No. 88 at 10:17-24, 35:3-24; ECF No. 89 at 35:8-13.)

New shareholder bonuses were subject to a vesting schedule, such that they were paid 20% of the calculated bonus in the first year, 40% of the bonus in the second year, 60% in the third year, 80% in the fourth year, and 100% in the fifth year.  (ECF No. 89 at 17:23-20:8.)  The non-vested portion of a new shareholder's bonus calculation—80% in the first year, 60% the second year, 40% the third year, 20% the fourth year—were not deducted from a shareholder's received income, but instead were paid directly to the other shareholders.  (Id.)  Additionally, the non-vested amounts were not capped at a particular dollar amount.  (Id.)  During her tenure at West Clinic, Dr. Fenton was subject to the same compensation model and vesting schedule as other new medical oncology shareholders.  (ECF No. 87 at 119:1-120:13, 189:23-191:6.)

In January 2016, Mr. Mounce met with Dr. Fenton to discuss questions she had about the compensation model, following receipt of one of her quarterly bonuses.  (ECF No. 88 at 72:10-73:3; Exs. 31, 36.)  Following that meeting, Dr. Fenton emailed Mr. Mounce additional questions about the compensation model and vesting schedule.  (Ex. 31.)  Mr. Mounce responded by sending Dr. Fenton a spreadsheet that detailed the components of her bonus calculation.  (Id.; Ex. 37.)

In January 2017, Dr. Fenton and Mr. Mounce had a phone conversation in which Mr. Mounce provided an explanation of Plaintiff's 2016 bonus calculation.  (ECF No. 88 at 77:11-22; Ex. 38.)  During that call, Mr. Mounce stated that her total bonus calculation was $747,243, and that, per the vesting schedule, she received 40% of this bonus.  (ECF No. 88 at 78:7-16.)  Dr. Fenton took contemporaneous notes on a "sticky" note during the call, detailing the various

components of her bonus calculation.  (Id. at 77:11-22; Ex. 7.)  After January 2017, Dr. Fenton

did not ask Mr. Mounce further questions about her bonus calculations.

Based on the vesting schedule, The West Clinic paid Dr. Fenton the following bonus

amounts, and distributed the following non-vested bonus amounts to the other shareholders from

2015 to 2019.

|       | Percent & Bonus Paid to Fenton | Percent & Bonus Redistributed |
|-------|-------------------------------|-------------------------------|
| 2015  | 20%:  $30,632.17              | 80%:  358,931.46              |
| 2016  | 40%:  $298,898.00             | 60%:  $448,345.91             |
| 2017  | 60%:  $392,843.45             | 40%:  $261,895.63             |
| 2018  | 80%:  $440,950.63             | 20%:  $110,237.66             |
| 2019  | $0[2]                         | N/A                           |
| **Total** | **$1,163,324.25**         | **$1,179,410.66**             |

(See ECF No. 89 at 17:23-20:8; Stip. ¶ 26.)

Dr. Fenton had a much different understanding of the vesting schedule and shareholder

compensation model.  At trial, she testified that, during her 2011 interview, Mr. Mounce stated

that, after two years of employment as a non-shareholder, she would have the option to become a

shareholder through a "buy in"[3] process.  (ECF No. 88 at 54:6-55:2.)  Under this model, she

---

[2] There were no bonuses paid to shareholders in 2019.  (Stip. ¶ 27.)

[3] During the course of this litigation, there has been much confusion and contest about
Defendants' use of the term "buy in."  The Court finds that The West Clinic's officers and
shareholders regularly used the term "buy-in" as a general shorthand for the new shareholder
compensation model, but that the compensation model was not a true buy-in, whereby new
shareholders are required to purchase an equity stake in the business.  (See Ex. 31; ECF No. 87
at 49:8-50:9, 160:14-162:4.)  While there was no testimony to this effect, the Court can speculate
that Defendants' incongruous use of the term "buy-in" may have contributed to Dr. Fenton's
misunderstanding of the shareholder compensation model.

thought that $500,000 would be deducted from her bonuses in a declining manner over five years.  (Id.)  She testified that Mr. Mounce stated that after she fully paid the $500,000 buy-in, she would receive that money back as a "buy-out" if she left the West Clinic.  (Id.)  Dr. Fenton also testified that Mr. Mounce promised that the bonus deductions would be capped at $500,000.  (Id. at 118:2-10.)

According to Dr. Fenton, Dr. Schwartzberg confirmed and repeated the terms of the $500,000 buy-in as she understood it during their December 2011 phone call.  (Id. at 56:25-57:25.)  Dr. Fenton testified that she trusted Mr. Mounce's and Dr. Schwartzberg's representations about the $500,000 buy-in, and that she relied upon these promises in deciding to accept employment at The West Clinic and decline another offer for an oncology position at the University of Pittsburgh ("Pittsburgh") that offered a higher starting salary.  (Id.; Id. at 55:7-9, 58:6-114.)  She testified that Dr. Schwartzberg also confirmed the $500,000 buy-in during their August 2014 meeting in which he convinced her to stay at the West Clinic.  (Id. at 65:18-66:20.)  According to Dr. Fenton, these conversations with Mr. Mounce and Dr. Schwartzberg formed the basis of an oral buy-in agreement between her and The West Clinic.  (Id. at 118:2-8; 153:3-6.)

During cross-examination, Dr. Fenton gave inconsistent testimony about when and how the buy-in would be completed.  While Dr. Fenton admitted that Mr. Mounce stated that bonuses would be withheld according to an 80%/60%/40%/20% vesting schedule, she testified that she understood these figures to be examples of how the percentages could decline over the course of five years, not necessarily the percentages that would be used.  (Id. at 115:2-25, 124:23-125:7, 126:1-15.)  She knew the buy-in would be performed over the course of five years, and stated that the actual percentage withheld would fluctuate in a decreasing manner depending on the

overall size of the bonus, to ensure $500,000 was deducted from her bonuses over the course of five years.  (Id. at 150:10-21.)  Upon questioning by the Court, Dr. Fenton confirmed that this was her understanding of the buy-in.  (Id. at 195:11-20.)  She further testified that, by January 2017, she suspected that more than $500,000 had been withheld from her bonuses.  (Id. at 104:17-105:3, 184:8-10.)  She stated that, after her discussions with Mr. Mounce in 2015 and 2016, she felt intimidated from asking additional questions about bonus calculations during her remaining time at The West Clinic.[4]  (Id. at 81:21-82:5.)

Dr. Fenton offered contradictory explanations of the compensation model during this lawsuit.  To begin, Dr. Fenton's trial testimony conflicted with her previous statements about the alleged buy-in agreement.  At trial, Dr. Fenton stated that the buy-in had to be paid out over the course of five years.  However, in her Response to Defendants' Motion for Summary Judgment and Statement of the Case in the Pretrial Order, Dr. Fenton stated that her $500,000 buy-in could have been paid in full in one year depending on the size of her bonus for that year.  (ECF No. 53 at PageID 893; ECF No. 84 at 1299.)

Dr. Fenton's trial testimony about the yearly percentage to be withheld from her bonus similarly contradicted her earlier statements in this case.  At trial, Dr. Fenton testified that the percentage of the withheld bonus would fluctuate in a decreasing manner depending on the size of the yearly bonus.  However, during her deposition, she made no mention that the yearly percentages could fluctuate and testified that her bonus would be withheld according to 80%/60%/40%/20% vesting schedule until the $500,000 cap was met.  (ECF No. 52-16 at 84:2-13.)  Dr. Fenton's Complaint, Response to Defendants' Motion for Summary Judgment, and

---

[4] On April 24, 2020, Dr. Fenton gave notice of her resignation effective July 31, 2020. (Ex. 2.)  After inquiring about receiving her $500,000 buy-out, Mr. Graves informed Dr. Fenton that there was no buy-out.  (Ex. 8; ECF No. 88 at 101:1-20.)

Statement of the Case in the Pretrial Order all similarly stated that her bonuses would be withheld according to a fixed 80%/60%/40%/20% vesting schedule. (ECF No. 1 at PageID 5; ECF No. 53 at PageID 891; ECF No. 84 at PageID 1298.)

In addition to contradicting herself on the witness stand, Dr. Fenton's version of events do not add up. For example, Dr. Fenton testified that, by January 2017, she suspected that more than $500,000 had been withheld from her bonuses. (ECF No. 88 at 104:17-105:3, 184:8-185:18.) However, she did not voice any concern about a violation of the alleged $500,000 buy-in cap until her resignation in July 2020—approximately three and a half years later. (Exs. 7-8.) Dr. Fenton testified that she did not raise this issue for so long because she felt Mr. Mounce pressured her to not ask additional questions about her annual bonus calculations. (ECF No. 88 at 81:21-82:10.) However, she did not identify any specific evidence of intimidation or pressure. If anything, the evidence shows that the West Clinic generously accommodated Dr. Fenton's requests for more information, providing spreadsheets detailing the individual bonus components and scheduling phones calls and meetings to help her better understand the bonus calculations. (See Exs. 31, 37-38; ECF No. 88 at 77:11-22.)

Dr. Fenton also failed to provide any evidence that could corroborate her testimony about the alleged $500,000 buy-in. While she took notes of the various components of her bonus calculations, she failed to reduce the terms of the alleged buy-in to writing or introduce any notes or written communications that could corroborate her testimony. (See ECF No. 88 at 154:16-155:7.) She also failed to identify any witnesses who could support her testimony.

Dr. Fenton argues that at least some West Clinic physicians, including Dr. Somer, were subject to the same $500,000 buy-in, thereby providing support for the proposition that she too was subject to the same buy-in. (ECF No. 95 at PageID 2249-50.) To be sure, the testimony of

Drs. Tauer and Somer established that some shareholders paid a $500,000 administrative fee during Mr. Steve Copeland's tenure as CEO.  (ECF No. 88 at 25:20-26:17, 39:16-18; ECF No. 89 at 46:3-47:23.)  However, several of The West Clinic witnesses explained that the $500,000 administrative fee for new shareholders ended in 2010—before Dr. Fenton's interview and her employment with The West Clinic—when Mr. Mounce replaced Mr. Copeland as CEO.  (ECF No. 87 at 139:17-141:17, 156:14-15; ECF No. 88 at 25:20-26:17.)  Dr. Somer also testified that the pre-2010 administrative fee was not a buy-in, but a payment made through equal monthly deductions from the shareholder's compensation.  (ECF No. 89 at 46:3-47:23.)  Furthermore, the testimony of Drs. Tauer and Somer established that there was no promise to return the $500,000 administrative upon a shareholder's termination under the pre-2010 compensation model.  (ECF No. 88 at 39:19-23; ECF No. 89 at 47:24-48:3.)

In contrast to Dr. Fenton, Defendants provided credible and corroborated evidence to support their contention that they did not enter into an oral buy-in agreement with Dr. Fenton. The credible testimony of Mr. Graves, Mr. Mounce, and Drs. Tauer, Schwartzberg, and Somer established that Defendants treated Dr. Fenton the same way as other new shareholders and put her on the same vesting schedule as other new shareholders.  (ECF No. 87 at 119:24-120:24, 189:7-11; ECF No. 88 at 26:25-28:2, 31:25-32:3; ECF No. 89 at 12:21-24, 54:16-20.)  Furthermore, emails between Dr. Fenton and the West Clinic corroborated the testimony describing the vesting schedule and established that Defendants routinely disclosed information to Dr. Fenton on how they calculated her bonuses and overall compensation.  (Exs. 31, 36-38.)  Lastly, Defendants provided overwhelming witness testimony and documentary evidence that established that there were no other shareholders who had a $500,000 cap on the non-vested portion of their bonuses, or who received a $500,000 payment upon resignation, and that no

individual West Clinic officer would have had the authority to promise repayment upon resignation, absent full board approval.  (Exs. 53-54; ECF No. 87 at 92:15-93:10, 190:3-5; ECF No. 88 at 28:3-5, 31:12-32:3, 240:5-241:3, 243:1-17; ECF No. 89 at 11:25-12:8.)  Therefore, the Court finds Defendants' testimony describing the shareholder compensation model to be credible, and credits their testimony over Dr. Fenton's.

### III.    Operating and Shareholder Agreements

At the time Dr. Fenton gave notice of her resignation, she had a 5% ownership interest in five entities:  The West Clinic, West Holdco, West Capital, West Desoto, and West Union. (Stips. ¶ 17, 18.)  The applicable operating and shareholder agreements (the "operating agreements") for the five entities set forth various methodologies to determine the price to be paid to a departing member, one who was relinquishing their ownership interests.

The Operating Agreement of The West Clinic and the Shareholder Agreement of West Holdco state that, upon the occurrence of a "Triggering Event," the regularly employed accountant of the company shall calculate a purchase price based on a specific methodology to determine each entities' net worth.  (Exs. 13, 42.)  The Operating Agreements for West Union and West Desoto state that, upon the occurrence of a "Precipitating Event," "the Company shall cause a determination of the Fair Value of the Membership interest," and "the Company. . . shall thereupon purchase . . . the Selling Member's Membership Interest . . . for fair cash at the Fair Value of Membership Interest."  (Exs. 11-12.)  These agreements define Precipitating Event as including a shareholder's termination of employment for any reason.  (Exs. 11-12.)  They also define Fair Value of Membership Interest as the greater of (i) $100; or (ii) that amount which is equal to the Book Value of the Member's Percentage Interest on the last day of the month during which the triggering event occurs, as determined by the Company's regularly employed

accountant.  (Exs. 11-12.)  Book Value is defined as "the net worth of the company, as determined for federal income tax purposes by the independent Certified Public Accountant who is then servicing the account of the Company in accordance with sound and accepted accounting principles and practices consistently applied."  (Exs. 11-12.)

The West Capital Operating Agreement does not state that an outgoing member must sell their interest or that West Capital must purchase their ownership interest.  (Ex. 10.)  However, the agreement defines Fair Market Value as "the fair value of such assets . . . as between a willing buyer and a willing seller in an arm's length transaction . . . determined in good faith by the Board, acting reasonably, taking into account all relevant factors determinative of value . . ." (Id.)

In January 2012, The West Clinic entered into a services relationship with Methodist Healthcare-Memphis Hospitals ("Methodist").  (ECF No. 89 at 17:25-18:5.)  During its relationship with Methodist, The West Clinic did not own assets, such as real estate and accounts receivable.  (ECF No. 87 at 217:1-3; ECF No. 88 at 233:16-234:6.)   Instead, Methodist paid The West Clinic based on physician RVUs.  (ECF No. 88 at 234:2-6.)  Before entering into the Methodist relationship, The West Clinic sold all of their real estate to third parties.  (ECF No. 87 at 62:25-63:7, 69:11-20.)

In 2018, The West Clinic's shareholders voted to unwind the Methodist relationship and enter into a new services relationship with OneOncology.  (ECF No. 88 at 82:11-18, 88:3-8.)  As part of this unwind, The West Clinic had to reacquire assets, such as real estate, equipment, and accounts receivable, to continue its practice.  (ECF No. 88 at 255:14-22.)  For example, West Wolf River purchased The West Clinic's main campus office building, located at 7945 Wolf

River Boulevard, for $51 million dollars.  (Stip. ¶ 24.)  The West Clinic self-financed these purchases, resulting in substantial debt.  (Id.; ECF No. 87 at 116:13-15.)

After submitting her resignation, Dr. Fenton met with Mr. Evensky to discuss The West Clinic's proposed termination agreement.  (ECF No. 88 at 97:21-22, 98:18-20, 248:25-249:11.)  The proposed Termination, Purchase and Release Agreement provided Dr. Fenton with a total payment of $200, which reflected $100 for Dr. Fenton's ownership interest in West Union and West Desoto as those entities had no positive net worth at the time of her resignation.  (Ex. 9; ECF No. 88 at 246:22-247:13.)  Dr. Fenton declined to sign the proposed termination agreement and rejected the $200.  (ECF No. 88 at 98:18-100:2.)

West Clinic's regularly employed accountants performed the calculations specified in the various operating agreements and concluded that there was no net worth in the entities that required payment beyond the nominal $100 payments for her ownership interests in West Union and West Desoto.  (Ex. 57; ECF No. 88 at 259:20-260:8, 269:1-6.)  Given the significant debt The West Clinic incurred as part of the Methodist unwind, The West Clinic's liabilities far exceeded the value of its assets, resulting in a negative net worth.  (ECF No. 87 at 58:2-13, 116:14-15; ECF No. 88 at 297:12-19; ECF No. 89 at 45:10-25.)  As of December 31, 2019, West Union and West Desoto had a negative net worth.  (Ex. 57.)  And, as of December 31, 2020, The West Clinic had a net worth of negative $17,972,714 and West Wolf River had a net worth of negative $8,223,312.  (Exs. 55-56.)  While these financial statements were not dated as of Dr. Fenton's last day of employment on July 31, 2020, the evidence would not have been significantly different, or shown a positive net worth, as of Dr. Fenton's last day of employment. (See Exs. 55-57; ECF No. 87 at 110:16-111:10; ECF No. 88 at 263:4-12; ECF No. 89 at 45:10-25.)

Dr. Fenton disputes that the entities had a negative net worth at the time of her resignation.  (ECF No. 95 at PageID 2256-57.)  She offered evidence showing that The West Clinic's Tennessee Franchise and Excise ("F&E") Tax Returns indicate that each of The West Clinic entities had a positive net value, and that, under the various operating agreements, she was entitled to a 5% share of the net value of the five West Clinic entities in which she had an ownership stake.  (Id.; Ex. 17.)

For several reasons, the Court finds The West Clinic's evidence of its own net worth to be more credible than Dr. Fenton's.  As an initial matter, Dr. Fenton failed to introduce evidence, such as expert testimony, that could support her argument that the West Clinic had a positive net worth at the time of her resignation or that the F&E tax returns are a reliable measure of net worth.  Without additional proof, the F&E tax returns have little probative value as evidence of the West Clinic's net worth because they are state tax returns, whereas the operating agreements for West Union and West Desoto specify that Book Value is the net worth of the company, as determined for federal income tax purposes.  (Exs. 11-12, 17.)

The West Clinic also introduced evidence to rebut Dr. Fenton's assertion that it had a positive net value.  For example, Mr. Evensky's testimony explained how the calculation of net worth on the F&E return does not reflect West Clinic's actual net worth as the F&E net worth calculation includes rental payments for assets that the West Clinic does not own.  (Ex. 17; ECF No. 88 at 271:2-19, 272:7-10, 273:2-274:1, 275:11-276:7.)  The West Clinic's evidence of negative net value was further corroborated by Mr. Graves' and Mr. Evensky's testimony which established that every departing shareholder during Mr. Mounce's and Mr. Graves' tenures received the same $200 payment for their ownership interests.  (ECF No. 87 at 55:21-24, 59:7-16; ECF No. 88 at 246:22-247:13.)  For these reasons, the Court credits the West Clinic's

evidence of net worth and finds that the West Clinic had a negative net worth at the time of Dr. Fenton's resignation.

## CONCLUSIONS OF LAW

Before deciding this matter based on all of the evidence presented at trial, the Court must first consider Defendants' pending Motion for Judgment on Partial Findings, (ECF No. 86). Once a party has been fully heard on an issue, the opposing party may seek a judgment against that party on any claim or defense that cannot be maintained based on the evidence offered.  Fed. R. Civ. P. 52(c).  At the close of Plaintiff's proof, Defendants moved for judgment on all claims. Therefore, the Court will analyze Dr. Fenton's claims—breach of the alleged oral buy-in agreement, breach of the operating agreements, and conversion—under two different standards. First, the Court will evaluate whether Dr. Fenton, at the close of her case, provided evidence to establish legally sufficient causes of action.  Next, any surviving claims will be analyzed under the preponderance of evidence standard based on the entirety of the evidence presented at trial.

For the reasons discussed below (Section I), based on the proof offered by Dr. Fenton during her case-in-chief, the Court finds that the alleged oral buy-in agreement is barred by the statute of frauds and that there is no applicable exception to the statute of frauds.  The Court also finds that Dr. Fenton failed to establish her conversion claim.  However, the Court finds that there was a legally sufficient evidentiary basis to find for Dr. Fenton on her claim for breach of the operating agreements.

Therefore, the Court **GRANTS** Defendants Motion for Judgment on Partial Findings as to Dr. Fenton's claims for breach of the oral buy-in agreement and conversion, but **DENIES** the Motion as to her claim for breach of the operating agreements.  Because the claim for breach of the operating agreements survived the Motion for Judgment on Partial Findings, the Court then

analyzes this claim under the preponderance of evidence standard.  (Section II, below.)  Based on

the entire record at trial, the Court finds that Dr. Fenton failed to prove by a preponderance of the

evidence that Defendants breached the operating agreements.

## I.   Judgment on Partial Findings

Each claim is evaluated below based on the proof offered by Plaintiff in her case-in-chief.

### A.   Breach of the Oral Buy-In Agreement

#### 1.   Statute of Frauds' One-Year Requirement

To prevail on a breach of contract claim under Tennessee law, a plaintiff must prove:

(i) the existence of an enforceable contract, (ii) nonperformance that amounts to a material

breach, and (iii) damages that were caused by the breach.  ARC LifeMed, Inc. v. AMC-Tenn.,

Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).  Contracts need not be in writing to be

enforceable.  Burton v. Warren Farmers Coop., 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002).

However, under Tennessee's statute of frauds, certain "contracts are not considered valid and

enforceable unless they are memorialized in a writing."  Rhynes v. Bank of Am., No. 12–2683,

2013 U.S. Dist. LEXIS 42713, at *24-5 (W.D. Tenn. Mar. 26, 2013) (citing Shah v. Racetrac

Petroleum Co., 338 F.3d 557, 573 (6th Cir.2003)).  Specifically:

> [n]o action shall be brought . . . upon any agreement or contract which is not to be
> performed within the space of one (1) year from the making of the agreement or
> contract[,] unless the promise or agreement, upon which such action shall be brought, or
> some memorandum or note thereof, shall be in writing, and signed by the party to be
> charged therewith or some other person lawfully authorized by such part.

Tenn. Code Ann § 29-2-101(a)(5).

However, because Tennessee courts generally try to uphold contracts rather than defeat

them, the statute of frauds is construed "very narrowly."  Birdwell v. Psimer, 151 S.W. 916, 919

(Tenn. Ct. App. 2004).  Tennessee courts "have declined to construe a contract to require

performance over more than one year if to do so would render the contract unenforceable because of the statute of frauds." Price v. Mercury Supply Co., 682 S.W.2d 924, 932 (Tenn. Ct. App. 1984).  In determining whether an agreement falls within the statute of frauds' one-year provision:

> The question is not what the probable, expected, or actual performance of the contract may be, but whether, according to the reasonable interpretation of its terms, it requires that it should not be performed within the year.  Unless the court, looking at the contract in view of the surroundings, can say that in no reasonable probability can such agreement be performed within the year, it is its duty to uphold the contract.

Id. (emphasis added) (citing Boutwell v. Lewis Bros. Lumber Co., 182 S.W.2d 1, 3 (Tenn. Ct. App. 1944)).  For this reason, "there must be evidence to demonstrate that the parties specifically agreed that the contract absolutely would not be performed within one year for it to run afoul of the statute of frauds." Guardsmark (Puerto Rico), LLC v. Miramar Real Est. Mgmt., Inc., No. 2:08-CV-2317, 2008 WL 11321178, at *4 (W.D. Tenn. July 30, 2008) (quoting Birdwell, 151 S.W.3d at 919 (citations omitted)).

Dr. Fenton failed to allege the existence of an enforceable oral contract as her buy-in agreement violates the one-year provision of the statute of frauds.  During cross-examination, Dr. Fenton testified that her buy-in had to be paid out over the course of five years and that the percentage of the withheld bonus would fluctuate in a decreasing manner, depending on the overall size of the bonus, to ensure $500,000 was deducted from her bonuses over the course of five years.  After cross-examination, the Court confirmed that it was her understanding that the buy-in agreement had to be completed over the course of five years.  (ECF No. 88 at 195:11-21.)  Therefore, according to Dr. Fenton's testimony explaining the terms of the oral buy-in agreement as she understood them, there was no reasonable probability that the buy-in could have been

performed within one year.[5]  As such, the statute of frauds bars enforcement of the buy-in agreement unless there is an applicable exception.

## 2.  Statute of Frauds' Exceptions

In the alternative, Dr. Fenton argues that, even if the statute of frauds applies, the oral buy-in agreement is still enforceable based on the part performance exception and equitable estoppel.  (ECF No. 95-1 at 2263-64.)

Tennessee courts recognize a part performance exception to the statute of frauds, which is applicable to oral contracts other than for the sale of land.  Shedd v. Gaylord Ent. Co., 118 S.W. 3d 695, 698 (Tenn. 2003).  However, this exception is applied with care, as too broad of an application, "could easily result in the exception of partial performance swallowing the rule of the Statute of Frauds, and allowing the proliferation of those very evils that the Statute was created to guard against."  Id.  While Tennessee courts have not articulated the precise contours of the exception, in Buice v. Scruggs Equip. Co., 250 S.W.2d 44 (Tenn. 1952), the Supreme Court of Tennessee explained that, to establish the partial performance exception, a plaintiff must show that:  (i) Defendant's acts and conduct amount to a representation that they would stand by their agreement and not use the statute of frauds to avoid performance, and (ii) relying on defendant's representation, plaintiff performed their obligations under the oral contract, so as to alter their position and incur an unjust and unconscionable loss.

Here, Dr. Fenton did not meet either prong.  As to the first prong, Defendants did not act as if they would stand by the alleged terms of the buy-in.  Dr. Fenton alleges that, as part of the

---

[5] The Parties dispute the date on which Dr. Fenton accepted the alleged oral buy-in agreement.  (See ECF No. 95-1 at PageID 2263; ECF No. 96 at PageID 2296.)  Because the buy-in had to be performed over the course of five years, that date has no bearing on whether the agreement could be performed within a year.  Therefore, the Court declines to address this issue.

oral agreement, Defendants promised to cap the buy-in at $500,000, and that bonus deductions would take place over the course of five years.  However, by the end of 2016, after only two years, Defendants acted inconsistent with the alleged terms by withholding more than $500,000 from Dr. Fenton's bonuses.

As to the second prong, Dr. Fenton failed to show that she incurred an unjust and unconscionable loss.  At trial, Dr. Fenton testified that she had an offer for the Pittsburgh job that had a higher starting salary than The West Clinic, but that she turned down this offer because The West Clinic offered her the possibility of becoming a shareholder.  Turning down a higher salary but becoming a shareholder, without more, describes a choice between two objectives, not a loss.  Indeed, by her own admission, Dr. Fenton ended up being very well compensated at The West Clinic, making, on average, about $900,000 per year in her five years as a shareholder.  (ECF No. 88 at 161:24-162:1.)   She failed to show that she earned less at The West Clinic than what she would have in Pittsburgh or that she lost out on some valuable career experience that she would have otherwise gained.  Because Dr. Fenton cannot meet either of the two prongs, the partial performance exception does not apply.

Next, Dr. Fenton argues that the oral buy-in agreement is enforceable because equitable estoppel applies.  Equitable estoppel applies where the proof shows:  (i) conduct that either amounts to a false representation or concealment of material facts; (ii) the defendant's intention or expectation that the other party would act upon the defendant's conduct; and (iii) defendant's knowledge, actual or constructive, of the actual facts.  Talkington v. Anchor Gasoline Corp., 821 F. Supp. 505 (M.D. Tenn. 1993); Baliles v. Cities Service Co., 578 S.W.2d 621 (Tenn. 1979).  Furthermore, a plaintiff must show:  (i) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (ii) reliance upon the conduct of the party estopped; and

(iii) prejudicial change of position in reliance on that conduct.  Robinson v. Tennessee Farmers Mut. Ins. Co., 857 S.W.2d 559, 563 (Tenn. Ct. App. 1993).  Equitable estoppel only applies "in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud."  Jarrett v. Epperly, 896 F.2d 1013, 1019 (6th Cir. 1990) (citing Baliles, 578 S.W. 2d at 624).

Dr. Fenton cannot invoke equitable estoppel as she did not submit any evidence showing that Defendants made any false representations or concealed any facts.  Aside from her own testimony, which for the reasons explained above the Court does not find to be credible[6], Dr. Fenton did not produce evidence that showed that Defendants were not truthful in explaining the details of the shareholder compensation model.  Rather, the evidence offered matched Defendants' explanation of the arrangement.

Furthermore, Dr. Fenton possessed the means to obtain knowledge of the truth of the details of the compensation model, either through asking questions of West Clinic leadership or raising issues related to the buy-in when new shareholders compensation was discussed at regular shareholder meetings.  Indeed, the proof showed that she asked questions previously, which were answered.  For these reasons, Dr. Fenton cannot invoke equitable estoppel as an exception to the statute of frauds.

Because the oral agreement is subject to the one-year provision of the statute of frauds and no exception applies, Dr. Fenton's oral buy-in agreement is barred by the statute of frauds.[7]

---

[6] "Credible" in this situation is not intended to reflect truthfulness.  Rather, the Court concludes that Dr. Fenton's understanding of the terms do not make sense, resulting in confusion on her part.

[7] Defendants argue that Dr. Fenton's initial employment contract and subsequent written, fully integrated contracts would have superseded any oral agreement that existed between her and The West Clinic.  (ECF No. 96 at PageID 2293-94.)  As the oral buy-in agreement is barred

Therefore, Dr. Fenton failed to establish the existence of an enforceable contract related to her buy-in agreement during her case-in-chief.[8]  As such, as to Dr. Fenton's claim for breach of the oral buy-in agreement, Defendants' Motion is **GRANTED**.  Her claim for breach of the oral buy-in agreement is **DISMISSED**.

### B.  Breach of the Shareholder and Operating Agreements

Considering the same elements of a breach of contract claim as recounted above (see section I.A.1), Dr. Fenton presented sufficient evidence during her case-in-chief to establish a prima facie claim for breach of the operating agreements.

The Parties do not dispute that they entered into several binding, enforceable written operating agreements.  Furthermore, by introducing Defendants' state F&E tax returns, Dr. Fenton provided sufficient evidence to create an issue of fact as to whether Defendants had a positive net worth at the time of her resignation.  If they did, Defendants would have breached the operating agreements by only offering her $200.  And, by not receiving a 5% share of the net worth of the various entities—a value she contends would have greatly exceeded $200—Dr. Fenton would have incurred damages and financial loss because of Defendants' breach.

As discussed in the Findings of Fact, in their case-in-chief, Defendants provided overwhelming evidence to show that the F&E tax return had no probative value in determining the West Clinic entities' net worth.  However, at the close of her case, Dr. Fenton provided

---

by the statute of frauds, the Court need not decide the relationship between the alleged oral agreement and the other written contracts that Dr. Fenton entered into during her tenure at The West Clinic.

[8] Even if the oral buy-in agreement was not barred by the statute of frauds, Dr. Fenton failed to prove the existence of the oral buy-in agreement by a preponderance of the evidence.  Dr. Fenton's own testimony was the only evidence she offered to prove the existence of the oral agreement.  And, as discussed in the Findings of Facts, the Court did not find her testimony to be credible.

enough evidence to support a claim for breach of the operating agreements.  Therefore, Defendants' Motion for Judgment on Partial Findings is **DENIED** as to Dr. Fenton's claim for breach of the operating agreements.

### C. Conversion

As stated above, Dr. Fenton's conversion claim is limited to Defendants' alleged failure to repay the cost of the buy-in upon Dr. Fenton's resignation.  Conversion is "the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the property." Ralston v. Hobbs, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009).  The elements of a claim for conversion are:  "(1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel." White v. Empire Exp., Inc., 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012).  Money is generally considered to be intangible and not subject to a conversion claim unless a plaintiff can show that there is a determinate sum that the defendant was entrusted with for a certain purpose. PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp., 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).

Relevant here, a breach of contract claim and a tort claim, such as conversion, can be based on the same conduct.  A tort claim exists against a contracting party only where "a party breaches a duty which he owes to another independently of the contract." Calipari v. Powertel, Inc., 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002) (citing Mid–South Milling Co., Inc. v. Loret Farms, Inc., 521 S.W.2d 586, 588 (Tenn. 1975)).  Even "a willful breach of contract does not transform a breach of contract into a tort." Id.

Here, the tortious act complained of by Dr. Fenton—The West Clinic's alleged failure to return her $500,000 buy-in—is the same duty that she alleged that The West Clinic owed her under the terms of the oral buy-in agreement.  Because Dr. Fenton did not assert a duty that Defendants owed her independent of the buy-in agreement, she failed to establish a <u>prima facie</u> conversion claim.[9]  Therefore, as to Dr. Fenton's conversion claim, Defendants Motion is **GRANTED**, and her conversion claim is **DISMISSED**.

## II.    Consideration of Breach of Operating Agreements Claim at the Close of All Proof

Dr. Fenton's only surviving claim is for breach of the operating agreements.  While Dr. Fenton established a <u>prima facie</u> breach of the operating agreements, she failed to prove breach by a preponderance of the evidence.  Specifically, Dr. Fenton did not prove by a preponderance of the evidence that any of the West Clinic entities had a positive net worth at the time of her resignation, such that she would be entitled to any payment beyond $200.

As discussed in the Findings of Fact, Defendants' regularly employed accountants performed the calculations specified in the various shareholder agreements and concluded that there was no net worth in the entities in which Dr. Fenton had an ownership stake.  Through

---

[9] Although it does not change the outcome of the case, the Court rejects Defendants' argument that Dr. Fenton's conversion claim is barred by the statute of limitations.  (<u>See</u> ECF No. 96 at PageID 2301.)  Defendants argue, and Dr. Fenton seems to concede, that Dr. Fenton's conversion claim based on bonus deductions taken in excess of $500,000 accrued by January 2017, such that this claim would be barred by the three-year statute of limitations.  (<u>See</u> <u>id.</u> at 2302-03; ECF No. 95-1 at PageID 2265, n. 2.)  Although Dr. Fenton did not learn of Defendants' refusal to return the $500,000 until 2020, Defendants nonetheless argue this claim is time-barred under the single injury rule.  (ECF No. 96 at PageID 2303.)  However, the alleged failure to return the buy-in is distinct from the alleged bonus deductions taken in excess of $500,000.  Furthermore, Dr. Fenton did not gain sufficient information to know of Defendants' refusal to return the buy-in until her resignation in 2020, such that she was not aware of the full extent of her injury until that time.  Therefore, Dr. Fenton's conversion claim for the failure to return the buy-in accrued in 2020.  Furthermore, she initiated this action on December 22, 2021—well within the three-year statute of limitations period.  (<u>See</u> ECF No. 1.)  As such, her conversion claim is not barred by the three-year statute of limitations.

witness testimony and financial statements, Defendants persuasively showed that, because of the

significant debt incurred as part of the Methodist unwind, The West Clinic's liabilities far

exceeded the value of its assets, resulting in a negative net worth at the time of Dr. Fenton's

resignation.  Defendants also introduced evidence that showed that the F&E tax returns relied on

by Dr. Fenton had no probative value in evaluating the West Clinic's net worth.  Additionally,

Dr. Fenton failed to introduce any expert testimony that could corroborate her argument that The

West Clinic had a positive net worth or that the F&E tax returns had probative value.

Each entity's operating agreement must be examined to evaluate Dr. Fenton's claim of

breach.  As West Union and West Desoto did not have a positive net worth at the time of Dr.

Fenton's resignation, Defendants did not breach the West Union Partners Agreement or the West

Desoto Partners Agreement by offering $200 for her interest in both entities.  There was no

breach of the West Capital Agreement as that Agreement included no provision that required

payment to a departing member.  Finally, The West Clinic, PLLC Operating Agreement and

West Holdco, PC Shareholder Agreement required payments based on each entities' net worth

without a provision for a nominal $100 payment.  As the proof showed that these entities had no

net worth at the time of Dr. Fenton's resignation, Defendants did not owe any payment to Dr.

Fenton for her ownership stake in The West Clinic or West Holdco.  Dr. Fenton did not provide

evidence of any other breach of the operating agreements.  For these reasons, she failed to prove

breach of the operating agreements by a preponderance of the evidence, and the Court finds for

Defendants on her claim for breach of the operating agreements. [10]

---

[10] On July 7, 2023, Defendants filed a Motion to Disregard Portions of Plaintiff's
Proposed Findings of Fact and Conclusions of Law.  (ECF No. 98.)  In their Motion, Defendants
argue that two issues in Dr. Fenton's Proposed Findings of Fact and Conclusions of Law
exceeded the scope of the Pretrial Order and are therefore not properly before the Court.  (Id. at
PageID 2314.)  The first contested issue is Dr. Fenton's assertion that Defendants breached the

written operating agreements by including certain additional terms in their proposed termination agreement.  (Id.)  The second is Dr. Fenton's assertion of the Tennessee Revised Limited Liability Company Act as a basis for recovery of attorney fees and costs.  (Id.)  Defendants request that the Court disregard these assertions and award them the expenses and attorney's fees incurred in preparing the Motion.  (Id. at 2316-17.)

On July 17, 2023, Dr. Fenton filed a Response in Opposition to Defendants' Motion. (ECF No. 100.)  She argues that both of the issues were encompassed in a fair reading of the Pretrial Order.  (Id. at PageID 2323.)  In the alternative, Dr. Fenton requests to amend her pleadings pursuant to Fed R. Civ. P. 15(b)(2) if the Court finds that either or both issues were not within the scope of the Pretrial Order.  (Id.)  On July 31, 2023, Defendants filed a Response in Opposition to Plaintiff's Motion to Amend Pleadings for Issues Tried by Express of Implied Consent.  (ECF No. 102.)

A pretrial order controls the issues and claims that are properly before the Court at trial. Fed. R. Civ. P. 16(d).  "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint."  ECIMOS, LLC v. Carrier Corp., 2018 WL 7272058, at *3 (W.D. Tenn. Oct. 9, 2018) (quoting Rockwell Int'l Corp. v. United States, 549 U.S. 457, 474 (2007).  However, the pretrial order is not meant to include every single fact that will be presented at trial and courts are not expected to rigidly adhere to pretrial orders, especially where relaxing the agreement will not cause prejudice to the other party.  Shearon v. Womack, 2017 WL 6381432, at *1 (M.D. Tenn. Dec. 14, 2017) (citing 6A Charles A. Wright et al., FEDERAL PRACTICE AND PROCEDURE, § 1527 (3d ed. 2017)); see also Manley v. AmBase Corp., 337 F. 3d 237, 249 (2d Cir. 2003) (A pretrial order is not a "legal strait-jacket binding the parties and court to an unwavering course at trial.").  Furthermore, pretrial orders are to be liberally construed to cover any of the possible legal or factual theories that might be embraced by their language.  See Howard v. Kerr Glass Mfg. Co., 699 F.2d 330, 333 (6th Cir. 1983) (citing Trujillo v. Uniroyal Corp., 608 F.2d 815, 818 (10th Cir. 1979)).

The issue of whether Defendants breached the written operating agreements by including additional provisions in the proposed termination agreement is encompassed within a fair reading of the Pretrial Order.  One of the contested issues of law in the Pretrial Order is "Whether any of the Defendants breached their Operating Agreements or Shareholders' Agreements by not purchasing Dr. Fenton's ownership interests upon her voluntary resignation."  (ECF No. 84 at PageID 1315.)  This provision of the Pretrial Order naturally includes the proposed termination agreement offered by Defendants, which would have paid her $200 for certain ownership interests.  Therefore, while not explicitly stated in the Pretrial Order, the terms of the proposed termination agreement are encompassed within a fair reading of the Pretrial Order.

As for Dr. Fenton's assertion of the Tennessee Revised Limited Liability Company Act as a basis for recovery of attorney fees and costs, she cannot recover for any of her claims, and therefore is not entitled to fees and costs.  Therefore, Defendants' request to disregard this issue is moot.

26

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Judgment on Partial Findings is

**GRANTED** as to the breach of the oral-buy in and conversion claims, but **DENIED** as to the

breach of the operating agreements.  However, as to that claim, the Court finds for Defendant.

**IT IS SO ORDERED,** this 22nd day of August, 2023.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

As one of the contested issues is within a fair reading of the Pretrial Order and the other is moot, Defendants' Motion is **DENIED**.  Accordingly, the Court declines to award expenses and attorney's fees to Defendants.  Furthermore, Dr. Fenton's Motion to Amend Pleadings is **DENIED AS MOOT**.